Luis Raul BUENO–HERNANDEZ,
Appellant (Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

No. 86–35.

Supreme Court of Wyoming.

Sept. 8, 1986.

Leonard Munker and Martin McClain, State Public Defenders, Julie D. Naylor, Appellate Counsel, PDP and Gerald M. Gallivan, Director, and Jeffrey W. Hedger, Student Intern, of the Wyoming Defender Aid Program, for appellant.

A.G. McClintock, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen. and John W. Renneisen and Sylvia Lee Hackl, Sr. Asst. Attys. Gen., for appellee.

Before THOMAS, C.J., and BROWN, CARDINE, URBIGKIT and MACY, JJ.

MACY, Justice.

Appellant Luis Raul Bueno-Hernandez was found guilty by a jury of attempted second-degree sexual assault in violation of §§ 6–1–301(a) and 6–2–303(a)(v), W.S.1977, and sentenced to not less than 18 months nor more than four years in the Wyoming State Penitentiary.

We affirm.

Appellant raises the following issues on appeal:

"I. WHETHER THE PROSECUTION'S USE OF ITS PEREMPTORY CHALLENGES AMOUNTED TO SYSTEMATIC EXCLUSION OF AN ETHNIC GROUP FROM THE JURY IN VIOLATION OF APPELLANT'S RIGHT TO HAVE THE JURY REPRESENT A CROSS SECTION OF THE COMMUNITY AS CLOSELY AS POSSIBLE.

"II. WHETHER APPELLANT'S CONFESSION SHOULD HAVE BEEN DECLARED INADMISSIBLE BY THE TRIAL COURT BECAUSE IT WAS NOT VOLUNTARY.

"III. WHETHER THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION FOR A NEW TRIAL FOR NEWLY DISCOVERED EVIDENCE.

"IV. WHETHER APPELLANT SHOULD HAVE BEEN CHARGED AND TRIED FOR A VIOLATION OF WYO.STAT. § 14–3–105 (1977) INSTEAD OF A VIOLATION OF WYO. STAT. § 6–1–301(a) (1977) AND § 6–2–303(a)(v) (1977)."

On the night of August 22, 1985, a nine-year-old girl was spending the night at her next-door neighbor's house. After watching a movie, the girl went to sleep on the couch in the living room. During the night, she was awakened when a man's hand reached up from the floor and began fondling her. She looked over the edge of the couch and saw appellant, her next-door neighbor's brother, lying on the floor between the couch and the coffee table. She got up to tell someone, but, upon looking back and seeing that appellant was asleep, she lay back down on the couch. Later, she was again awakened by appellant's touches. Several days later, the child told her parents what had happened, and appellant was arrested.

I

Appellant is a Mexican national. During voir dire, three members of the venire who were apparently of Mexican-American heritage were excluded from the jury by the prosecutor through the use of peremptory challenges. In chambers, prior to trial, appellant moved for a mistrial on the ground that the prosecutor's systematic exclusion of Mexican-Americans violated appellant's right to a fair and impartial jury. The trial court denied the motion, noting that no questions were asked of the venire members to establish that they were in fact Mexican-Americans. The court noted further that it was not prepared to take judicial notice of a Mexican-American background solely from the fact that the excluded venire members had Spanish surnames. Appellant now raises the claim before this Court that he was denied a fair and impartial jury by the prosecutor's use of peremptory challenges to exclude Mexican-Americans.

■ The test for determining whether peremptory challenges have been improperly used to exclude minorities from a jury was most recently articulated by the United States Supreme Court in *Batson v. Kentucky*, — U.S. —, 106 S.Ct. 1712, 90

L.Ed.2d 69 (1986).[1] There the Supreme Court held that although a defendant has no right to a petit jury composed in whole or in part of persons of his own race, the state may not purposefully exclude members of the defendant's race solely because of race. When challenging the jury selection process, the burden is on the defendant to prove the existence of purposeful racial discrimination.

"[A] defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury [by showing first] that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact * * * that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.' Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors * * * raises the necessary inference of purposeful discrimination.

\* \* \* \* \* \*

"Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging [the] jurcrs. * * * [T]he prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause. But the prosecutor may not rebut the defendant's prima facie case of discrimination by stating merely that he challenged jurors of the defendant's race on the assumption—or his intuitive judgment—that they would be partial to the defendant because of their shared race. * * * Nor may the prosecutor rebut the defendant's case merely by denying that he had a discriminatory motive or 'affirming his good faith in individual selections.'" Batson v. Kentucky, 106 S.Ct. at 1723 (citations omitted).

■ In the present case, it is undisputed that appellant is a member of a cognizable racial group. However, during voir dire no questions were asked to establish the race of the challenged venire members. Therefore, the only fact tending to show that members of appellant's race were excluded from the jury is that three of those challenged had Spanish surnames. Because appellant did not request that the voir dire be recorded, he can point to no other relevant circumstances which raise the inference that the prosecutor used his perempto-

---

**1.** Appellant claims that after *Batson v. Kentucky*, the reasoning employed by this Court in *Evans v. State*, Wyo., 653 P.2d 308 (1982), is no longer controlling. The basis of his claim is that in *Evans v. State* we relied on *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759, reh. denied 381 U.S. 921, 85 S.Ct. 1528, 14 L.Ed.2d 442 (1965), which was overturned by the United States Supreme Court in *Batson v. Kentucky*. Appellant's assertion that "the reasoning in *Evans* did not survive *Batson*" is not entirely correct. The portion of *Swain v. Alabama* rejected in *Batson v. Kentucky* concerned the evidentiary burden of proof placed on a defendant who claims that the state misused its peremptory challenges. *Swain v. Alabama* required the defendant to demonstrate circumstances under which prosecutors in the jurisdiction struck black jurors in cases other than the defendant's. In *Batson v. Kentucky*, the Supreme Court rejected that requirement, holding instead that a defendant may make a prima facie showing of

purposeful discrimination solely on the facts of his own case. Our holding in *Evans v. State* is unaffected by this change. There we said only that:

"Even if a peremptory challenge cannot be based upon a group bias, be it race, sex, occupation, religion, national origin, or whatever, the rule espoused by appellant recognizes as proper a challenge on grounds of specific bias; and here the specific reason existed, i.e., the challenges were premised on the juror's acquaintanceship with the defendant or members of his family." 653 P.2d at 310 (footnote omitted).

We held further that "[a]ppellant point[ed] to absolutely nothing in the record to reflect that the peremptory challenges * * * were for any reason other than that enunciated by the prosecuting attorney." *Id.* at 311. To this extent, *Evans v. State* remains unaffected by *Batson v. Kentucky*.

ry challenges to exclude venire members because of their race.

As the United States Supreme Court has said:

"We have confidence that trial judges, experienced in supervising *voir dire,* will be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination * * *." *Batson v. Kentucky,* 106 S.Ct. at 1723.

In the present case, the trial court apparently was not persuaded that, because of Spanish surnames or other circumstances, a prima facie case of purposeful discrimination existed.

Even assuming that this Court were to find appellant had established a prima facie case of purposeful discrimination, the prosecutor offered a sufficient neutral explanation for challenging the venire members to refute appellant's claim. In chambers, following appellant's motion for a mistrial, the prosecutor responded as follows:

"[T]he first [juror] challenged by the State * * * is known to our office through Mr. Green who had a history of dealing with her at Legal Services as has also Mr. Tristani. After discussing her in great length we unanimously decided she would not be an appropriate Juror in this case even though she does have a four and a half year old daughter.

"As to the next Juror * * * we knew there might also be a bias against our office because Dennis Grant in our office has sued him for collection * * *.

"Finally, * * * the last individual challenged by the State * * * is known to our office to be * * * anti-law enforcement."

Thus, the prosecutor offered a specific neutral explanation for exercising his peremptory challenges. He did not merely state that he challenged the jurors on the presumption that they could not be impartial because of their shared race, nor did he merely deny a discriminatory motive or affirm his good faith in individual selections. In each case, the challenged juror was known to him or his office and, on the basis

of that knowledge, the prosecutor had a specific reason, unrelated to the juror's ethnicity, for exercising a peremptory challenge.

Under these circumstances and absent any record of the voir dire proceedings, we find that appellant has failed to establish the existence of purposeful discrimination.

## II

On August 29, 1985, appellant was interviewed by Detective John Mugg of the Laramie County sheriff's office and Officer Arwin Olson of the Pine Bluffs police department. James Lucero was present as interpreter. Before the questioning began, *Miranda* warnings were read to and interpreted for appellant. When appellant indicated that he understood his rights and was willing to talk, the officers began questioning him about what occurred on the night of August 22, 1985. At first appellant denied even touching the child, but approximately half way through the interview he admitted that what the child said was true. He described touching the child underneath her clothes. He said he attempted to have intercourse with her but was unable to penetrate her because she was too young. He described inserting his finger into the child's vagina and then going into the bathroom to masturbate. Each of these statements was consistent with the child's version of what happened.

On October 9, 1985, appellant filed a motion to suppress his statements on the grounds that they were not voluntarily or intelligently given. Following a hearing on the motion prior to trial, the trial court issued the following decision letter:

"The defendant testified that he is 26 years old, he is a Mexican national * * * and had been in Pine Bluffs, Wyoming, for approximately six weeks prior to his arrest. * * * The defendant was educated in public schools in Mexico through the sixth grade. He does not understand, nor does he speak, the English language. He is unable to write the English language and is not literate in it.

The defendant stated * * * that he understands the nature of the charge and understands that the maximum sentence that could be imposed is twenty years imprisonment.

"[With respect to his statements to the police officers, the defendant] indicated that * * * he was told he had to talk about the case. The defendant denies that he was advised of his right to remain silent [and] states that [his] admission [of guilt] was obtained when the police said they would help him. He admits that the police did not say how they would help him, although he thought he would get out of jail and be sent to Mexico. He does not believe that the tape was on when the police said they would help. * * *

"The defendant's interpreter * * * testified that * * * the defendant is capable of conversing, is capable of understanding, is rational, and is able to express himself in his native language. Officer Mugg testified that * * * the tape recording is complete except for brief interruptions when the tape was flipped over * * *. The officer did not notice fear on the part of the defendant during his interview, did not see any confusion on the defendant's part, denies making promises to the defendant, denies offering to help the defendant, but admits having agreed to tell the district attorney that the defendant was cooperative. * *

"Mr. Lucero states that he advised the defendant of his rights * * *. Mr. Lucero reflected that he was able to communicate well with the defendant in his native language [and that] his responses were generally appropriate. The Court has in addition reviewed the tapes. At the outset, it is clear that the defendant was fully advised of his rights, and that this advice was translated to the defendant by Mr. Lucero. The defendant clearly indicated that he wished to talk to the officers. * * * Among other things, the defendant was advised: a) things would be a lot easier for the defendant if he tells the truth; b) that deputies do not

personally condemn wrongful acts by the defendant; c) please tell us what you did so that this matter can be put at peace; d) please help us; e) tell us why you did this, tell us what happened leading up to it; f) we understand you were away from your family and that you had been drinking the night that the offense occurred; g) we will explain to the district attorney that you were cooperative and did tell us what happened, but we can't guarantee what the district attorney will do; h) all human beings make mistakes, telling us what you did you will be able to make peace with yourself; i) [y]ou should cooperate with us by making a statement in order to see that justice is done; j) the officers will be fair to the defendant if he will cooperate and tell his side of the story.

"These statements are not verbatim, but reflect the tenor of statements made to the defendant by Officer Mugg at various time[s] throughout the interview before the defendant eventually made incriminating statements to him. At the end of the tape, it is interesting to note that after making the incriminating statements the defendant was again asked whether or not he had made the statements voluntarily and understood that no promises had been made to him by the officers. At that time the defendant reminded the officers that they had promised that they would explain to the district attorney that he was cooperative; and the officers acknowledged that they had made this statement. The defendant was further asked whether or not he had any further questions that he wished to have answered concerning the interview or matters relating to the investigation. The defendant had no further questions. Throughout the taped interview there [were] no discussions of a nature which would lead the Court to find that the defendant was assured or told that he would be returned to Mexico. At one time during the interview, Officer Mugg stated that this is America, not Mexico 'only with your help will we find the

truth.' To this statement, the defendant replied something to the effect that he understood that the United States was a country of law.

\* \* \* \* \* \*

" \* \* \* Here the defendant was advised of his constitutional rights as required by *Miranda v. State of Arizona,* 384 U.S. 436, 86 S.Ct. 1062 [1602], 16 L.Ed.2d 694 (1966). His rights were discussed with him and translated by an individual who is apparently able in this regard and well qualified to perform this duty for the sheriff's department. There is nothing in the record to indicate that there was any failure to understand or failure on the part of the translator to accurately reflect what was going on to the accused. The interview was not unduly lengthy, and there is no evidence of problems other than the language problems of the defendant, his lack of formal education and the fact that he was a Mexican national. Listening to the tape of the proceedings, it appears that in every respect the answers of the defendant were self protective, were appropriate, and reflected an understanding of the nature of the proceedings and the predicament in which the defendant found himself to be involved. The testimony of both Mr. Lucero and Mrs. Arias reflects that the defendant was·well able to make himself understood to them and did in fact communicate well in his native language."

On the basis of these findings, the court issued an order denying appellant's motion to suppress on November 27, 1985.

■ On appeal, appellant contends that the trial court erred in denying his motion to suppress his statements for the reason that the totality of the circumstances fails to demonstrate that his statements were voluntarily or knowingly made. That is, appellant contends that when viewed in light of his ethnic background, education and experience, the conduct of his interrogators was clearly coercive.

We recently articulated the standard for determining whether statements made by an accused are voluntary:

" 'The inquiry has two distinct dimensions. First the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.' " *Frias v. State,* Wyo., 722 P.2d 135, 142 (1986), quoting *Moran v. Burbine,* —— U.S. ——, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986) (citations omitted).

In the present case, unlike the accused in *Frias v. State,* appellant was given a full suppression hearing prior to trial. During that hearing, he presented witnesses and argument in support of his motion to suppress. Despite evidence that appellant is a Mexican national who came to the United States illegally not long before his arrest and whose understanding of the English language and American justice system is limited, the trial court found that his statements were voluntary. The court carefully considered appellant's background in light of testimony by his interpreters that appellant was fully conversant in his native language and capable of understanding and responding appropriately to the questions asked. Viewed in light of their testimony, the trial court did not find appellant's ethnic background or lack of education and experience sufficient to demonstrate an unknowing waiver.

In addition, the trial court listened to the tape of the interrogation and the testimony of appellant's interrogators. Despite appellant's assertion that he had not been fully advised of his rights and had been promised help if he cooperated, the trial

court found that the *Miranda* warnings were fully given to and interpreted for appellant, that no promises were made other than that the district attorney would be told if appellant cooperated, and that appellant had no apparent difficulty understanding what was happening.

The record sufficiently supports the trial court's findings. The totality of the circumstances in the present case is not comparable to that in *Frias v. State.* Testimony at the suppression hearing, together with the interrogation itself, adequately demonstrates that appellant was fully advised of his rights and waived them " 'with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it.' " *Id.* at 142, quoting *Moran v. Burbine*, 106 S.Ct. at 1141. The interrogation was conducted fairly and kindly, without threats, accusations, or intimidation. That appellant is a Mexican national of limited experience and education is not alone sufficient to establish that his statements were not voluntary. Given the totality of the circumstances surrounding his interrogation, we find that appellant's statements were voluntarily, knowingly, and intelligently made.

### III

In his next claim of error, appellant asserts that the trial court erred in failing to grant his motion for a new trial on the basis of newly discovered evidence.

During trial, appellant elicited testimony from several witnesses indicating that other Mexican nationals were visiting or staying at his brother's home that summer and, from such testimony, attempted to raise a doubt in the minds of the jurors as to whether the child actually knew who had assaulted her. To refute the misidentification theory, the State called Officer Olson who testified that he investigated the house in late June and early July following complaints that appellant's brother was housing a number of illegal aliens but that appellant's brother informed him in mid-July that he was no longer going to allow illegal aliens to stay at his home. The State also called the victim's mother who testified that she was not aware of anyone living next door on the night of the assault other than appellant, his brother, and his brother's wife.

At the close of the evidence and after the instruction conference, defense counsel informed the trial court that he had just learned from the prosecutor that an outstanding warrant existed in Colorado for the arrest of appellant's brother. He indicated that "[h]ad [he] known that [appellant's brother] was hiding out from Colorado [he might] have pursued that as an explanation of why [appellant's brother] would have wanted to stop any investigation and hide anybody who was living in the house." He then requested an opportunity to present evidence of the arrest warrant to the jury.

The trial court denied the request on the following grounds:

> "At this point we really don't know whether or not there was anything in Colorado. It doesn't add to nor take away from any of the evidence in this case. It cannot clearly be said to be exculpatory. * * * I would rule that placing the information before the Jury would simply * * * add to what is already confused, and would not really be even giving to the Jury matters that we know would be evidentiary."

Ten days later, appellant filed a motion for a new trial pursuant to Rule 34, W.R. Cr.P. On January 3, 1986, a hearing on the motion was held before the trial court. Appellant called Officer Olson who testified he received information a year earlier that there was an arrest warrant out for appellant's brother in Colorado. Appellant argued that a new trial should be granted because the newly discovered evidence tended to show that appellant's brother may have lied to Officer Olson about no longer housing illegal aliens in order to stop further investigation which might lead to discovery of the outstanding arrest warrant.

At the close of the hearing, the trial court denied appellant's motion for a new trial on the ground there was not a reasonable likelihood that evidence of the outstanding arrest warrant would lead a jury to a different result.

In support of his claim before this Court that the trial court erred in denying his motion for a new trial, appellant relies in part on the recent United States Supreme Court case of *United States v. Bagley*, —— U.S. ——, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). Appellant's reliance is misplaced. Application of the *Bagley* rule presupposes that the prosecutor suppressed evidence favorable to the accused. In the present case, appellant points to nothing in the record to demonstrate that the prosecutor knew about the arrest warrant prior to the time he informed appellant about it or that he suppressed that information. Instead, the record indicates that the prosecutor learned about the warrant following the instruction conference and immediately informed appellant. Absent evidence that the prosecutor knew about and suppressed information favorable to appellant, the *Bagley* rule does not apply.

■ In the alternative, appellant claims a new trial should be granted under the standard enunciated by this Court in *Opie v. State*, Wyo., 422 P.2d 84 (1967). That standard requires appellant to demonstrate:

"(1) That the evidence has come to his knowledge since the trial; (2) that it was not owing to the want of due diligence that it did not come sooner; (3) that it is so material that it would probably produce a different verdict, if the new trial were granted; and (4) that it is not cumulative, viz., speaking to facts in relation to which there was evidence at the trial." *Id.* at 85.

In the present case, appellant fails to demonstrate either that the evidence is not cumulative or that it would probably produce a different verdict were a new trial granted. Testimony to refute the inference that no one else was staying at the house on the night of the assault was elicited from three witnesses during the trial. Officer Thomas Mohren of the Pine Bluffs police department who responded to the call testified that two of appellant's brothers were at the house when he arrived. In addition, the victim testified that there were male Mexican "friends" at the house at various times but that she did not know if any of them lived there. Finally, appellant himself testified that there were three Mexican nationals living at the house in addition to himself and his brother. In light of this testimony, which in itself cast doubt upon appellant's brother's assertion that he was no longer housing illegal aliens, evidence that he might have been prompted to lie because of an outstanding warrant for his arrest is cumulative and is not so material that it would probably produce a different result if a new trial were granted. We find no error in the trial court's denial of appellant's motion for a new trial.

## IV

Appellant was charged with violations of §§ 6–2–303(a)(v) and 6–1–301(a). Section 6–2–303(a)(v) provides as follows:

"(a) Any actor who inflicts sexual intrusion on a victim commits sexual assault in the second degree if, under circumstances not constituting sexual assault in the first degree:

\* \* \* \* \* \*

"(v) At the time of the commission of the act the victim is less than twelve (12) years of age and the actor is at least four (4) years older than the victim; \* \* \* "

Section 6–1–301(a) provides in pertinent part:

"(a) A person is guilty of an attempt to commit a crime if:

"(i) With the intent to commit the crime, he does any act which is a substantial step towards commission of the crime."

Prior to trial, appellant filed a motion to dismiss in which he claimed that he was improperly charged with attempted second-degree sexual assault under §§ 6–2–303(a)(v) and 6–1–301(a); that he should

have been charged with fourth-degree sexual assault under § 6–2–305, W.S.1977; and that because fourth-degree sexual assault is a misdemeanor, the district court lacked jurisdiction to proceed with the case. More specifically, appellant argued that because the information did not allege actual sexual intrusion, an element of second-degree sexual assault under § 6–2–303(a), he properly should have been charged with fourth-degree sexual assault under § 6–2–305 which requires only sexual contact. On appeal, appellant complicates the issue further by abandoning his claim that he should have been charged with fourth-degree sexual assault under § 6–2–305 and claiming for the first time that he should instead have been charged with indecent liberties under § 14–3–105, W.S.1977.

Appellant places the Court in an unusual position. It is well established that we will not ordinarily consider matters raised for the first time on appeal. *Armijo v. State*, Wyo., 678 P.2d 864 (1984). It should be equally clear that we do not ordinarily consider matters that have not been briefed or argued before this Court. *Jones v. State*, Wyo., 568 P.2d 837 (1977). Applying these standards to the present case, we might ordinarily decline to address both the fourth-degree sexual assault claim asserted before the trial court and the indecent liberties claim raised for the first time before this Court. However, because each claim in essence challenges the appropriateness of the attempted second-degree sexual assault charge and resolution of the first issue necessarily disposes of the second issue, we will consider appellant's claims.

 It is well established that when an act violates more than one criminal statute, the State may prosecute under either so long as it does not discriminate against any class of defendants. *Kallas v. State*, Wyo., 704 P.2d 693, 694–95 (1985), quoting *United States v. Batchelder*, 442 U.S. 114, 99 S.Ct. 2198, 2204–05, 60 L.Ed.2d 755 (1979). In the present case, no claim is made that the prosecutor's decision to charge appellant with attempted second-degree sexual assault was discriminatory. Thus, that decision is beyond challenge absent a showing that the legislature intended to preclude use of the general attempt statute by the enactment of a special statute making the attempt a crime. *Capwell v. State*, Wyo., 686 P.2d 1148 (1984). Appellant fails to demonstrate and we are unable to find any such legislative intent.

As defined by § 6–2–301(a)(vii)(A) and (B), W.S.1977, sexual intrusion is:

"(A) Any intrusion, however slight, by any object or any part of a person's body, except the mouth, tongue or penis, into the genital or anal opening of another person's body if that sexual intrusion can reasonably be construed as being for the purposes of sexual arousal, gratification or abuse; or

"(B) Sexual intercourse, cunnilingus, fellatio, [anilingus] or anal intercourse with or without emission."

Section 6–2–301(a)(vi), W.S.1977, defines sexual contact as

"touching, with the intention of sexual arousal, gratification or abuse, of the victim's intimate parts by the actor, or of the actor's intimate parts by the victim, or [of] the clothing covering the immediate area of the victim's or actor's intimate parts; * * * "

 Given these definitions, neither § 6–2–303(a) nor § 6–2–305 constitutes a special statute specifically making the attempt a crime. On the one hand, § 6–2–303(a) clearly requires actual sexual intrusion; on the other hand, § 6–2–305 refers to a broad range of sexual contact which may or may not involve an attempt to commit sexual intrusion. Appellant's conclusion that "by its very definition fourth degree sexual assault is tantamount to an attempt" is clearly mistaken. Fourth-degree sexual assault may be committed in numerous ways without any intent or attempt to commit sexual intrusion. Because there is no statute specifically making attempted sexual intrusion

a crime, we find that the general attempt statute applies, and appellant was properly charged with attempted second-degree sexual assault.

We turn next to appellant's claim before this Court that he should have been charged with taking indecent liberties with a minor in violation of § 14–3–105.[2] He relies on the prefatory language of § 6–2–305, which provides as follows:

> "*Except under circumstances constituting a violation of W.S. 14–3–105,* any actor who subjects a victim to sexual contact under any of the circumstances of W.S. 6–2–302(a)(i) through (iv) or 6–2–303(a)(i) through (vi) without inflicting sexual intrusion on the victim and without causing serious bodily injury to the victim commits sexual assault in the fourth degree." (Emphasis added.)

Appellant argues that had the victim not been a minor, his acts would constitute fourth-degree sexual assault. Given the prefatory language of § 6–2–305 and the fact that the victim in this case was a minor, however, he contends that he should have been charged with violating § 14–3–105.

Appellant's argument presumes a finding by this Court that fourth-degree sexual assault would be the only proper charge were the victim an adult and that, pursuant to the prefatory language of § 6–2–305, indecent liberties is the only proper charge because the victim was a child. We make no such findings. We have already said that when an act violates more than one criminal statute, the State may choose to prosecute under either. *Kallas v. State,* *supra.* Therefore, it was within the prosecutor's discretion to charge attempted second-degree sexual assault.

Affirmed.

---

**2.** Section 14–3–105 provides:
"Any person knowingly taking immodest, immoral or indecent liberties with any child or knowingly causing or encouraging any child to cause or encourage another child to commit with him any immoral or indecent act is

guilty of a felony, and upon conviction shall be fined not less than one hundred dollars ($100.00) nor more than one thousand dollars ($1,000.00) or imprisoned in the penitentiary not more than ten (10) years, or both."