2003 WY 9

**Daniel JOHNSON, Appellant (Defendant),**

v.

**STATE of Wyoming, Appellee (Plaintiff).**

**No. 98–57.**

Supreme Court of Wyoming.

Jan. 23, 2003.

Rehearing Denied Feb. 18, 2003.

Ken Koski, State Public Defender, and Donna D. Domonkos, Appellate Counsel, Representing Appellant. Argument by Mr. Koski.

Hoke M. MacMillan, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Georgia L. Tibbetts, Senior Assistant Attorney General; and Robin Sessions Cooley, Assistant Attorney General, Representing Appellee. Argument by Ms. Cooley.

Before HILL, C.J., and GOLDEN, LEHMAN,* KITE, and VOIGT, JJ.

HILL, Chief Justice.

[¶1] The issues raised by Appellant, Daniel J. Johnson (Johnson), in this case concern the equal protection and the cruel

* Chief Justice at time of oral argument.

and unusual punishment protections afforded by the Wyoming Constitution, as well as the United States Constitution. Specifically, the instant issues and their implications arise when a defendant is charged with first degree felony murder, which carries a maximum punishment of death (though in this case a mandatory life sentence was imposed), and the underlying felony for that charge is a violation of the child abuse statute, which carries a maximum punishment of five years' imprisonment, including in those circumstances when the abuse results in the death of the child.[1] Other issues are urged, including the necessity of disqualifying the entire district attorney's staff when an appointed defense counsel accepts employment as an assistant district attorney; error in instructing the jury; the failure to have Johnson present when a supplemental instruction was furnished in response to a question from the jury; and prosecutorial misconduct. This Court is satisfied that the offenses of felony first degree murder and felony child abuse are distinguishable by different elements and that no constitutional violation arises from the invocation of the felony child abuse statute as the underlying felony for first degree felony murder. We are also satisfied that no reversible error is to be found in Johnson's other issues and, consequently, we will affirm.

## ISSUES

[¶ 2]   In his brief and supplemental briefs, Johnson raises these issues:

I.   Whether the trial court abused its. discretion by not disqualifying the entire Natrona County District Attorney's Office from the case at bar due to the appearance of impropriety?

II.   Whether appellant's equal protection rights under Article 1, §§ 2 and 34 of the Wyoming Constitution were violated as

two statutes declared the same acts to be crimes, and appellant was charged and convicted under the statute that penalized him more severely?

III.   Whether appellant's right to be free from cruel and unusual punishment was violated by the use of child abuse as the underlying felony for purposes of the felony murder rule?

IV.   Whether the trial court erred when it refused to give appellant's instruction on specific intent and when it incorrectly defined intentionally?

V.   Whether the trial court erred when it instructed the jury without the presence of appellant and without him waiving his right to be present?

VI.   Whether the prosecutor improperly commented on Johnson's right not to incriminate himself by inferring invocation of this right was evidence of guilt?

VII.   Whether the trial court erroneously instructed the jury?

The State rephrases those issues [2] as follows:

I.   Did the district court abuse its discretion in refusing to disqualify the Natrona County District Attorney's office from prosecuting the case at bar?

II.   Was appellant's conviction for felony murder violative of the equal protection and cruel and unusual punishment provisions of the United States and Wyoming Constitutions?

III.   Did the district court properly instruct the jury on the elements of the crime of felony murder upon which appellant was convicted?

IV.   Did the district court err in responding to jury questions without affording appellant the opportunity to be present?

---

1.   As we shall point out in more detail later in this opinion, the Legislature has subsequently amended the child abuse statute so that it no longer includes instances of abuse that result in death.

2.   In its supplemental brief of January 31, 2002, the State contends that this Court should not have resubmitted this case to the Court as it is currently constituted, and that if the Court was evenly divided, that should amount to an affir-

mance.   The Court is not equally divided and, hence, the State's authority with respect to the result of an evenly divided court is not apropos. The State cites no authority for the proposition that the Court as it is currently constituted is without authority to consider this case, and we find it unnecessary to formally address that aspect of the State's brief.

V. Statements made by the prosecutor during closing arguments constituted proper argument.

VI. The district court properly instructed the jury.

## INTRODUCTION

[¶ 3] By an Information filed on August 29, 1995,[3] Johnson was charged with first degree felony murder. The punishment for first degree murder is either life in prison or death. The death penalty was not sought in this case. In addition, Johnson was charged with two counts of inflicting injury on a child in violation of Wyo. Stat. Ann. § 6–2–503 (Michie 1988 and Supp.1994). Eventually, one of those counts was dismissed because the alleged crime was also the predicate felony for the felony murder charge. The jury found Johnson innocent of the other count.[4] The jury found Johnson guilty of first degree felony murder.

## FACTS

[¶ 4] At about 10:00 p.m., on August 23, 1995, the victim, Thomas Johnson, was left in Johnson's care when his wife, who was the victim's mother, went to work. The arrangement made by the Johnsons was that wife worked, and Johnson stayed home with the child because she had a better job. When she left for work, Johnson's wife testified that there did not appear to be any problems with the child. At about 4:40 a.m., on August 24, 1995, Johnson called his wife and told her the baby was not breathing right and to come home immediately. When she arrived, the baby was in a chair, and Johnson was on the phone with emergency personnel. Shortly thereafter, emergency personnel arrived to transport the child to the hospital. The first response to the call came from Johnson's neighbor and landlord, an Emergency Medical Technician (EMT) with the Casper Fire Department. The EMT noticed the baby was not breathing and that there was a small drop of blood around one of the child's nostrils. While waiting for an ambulance, the EMT immediately began administering CPR, but neither he nor other medical personnel were able to revive the child while transporting him to the hospital. When he arrived at the emergency room at 5:07 a.m., the child was in full arrest, unresponsive, with no pulse or respiration, his eyes were fixed and dilated, his tongue was bluish-yellow and stiff, and his body temperature was below normal at 93.5 degrees. Upon unsuccessfully trying to resuscitate the infant, the emergency room physician pronounced the infant dead at 5:52 a.m.

[¶ 5] Acting according to standard procedure after an infant's death, the treating physician notified the coroner. In addition to performing a physical exam, the treating physician obtained a sample of the infant's spinal fluid to culture. While the doctor was unable to detect any external injuries, he observed bilateral retinal hemorrhaging, indi-

3. There are a number of factors that contributed to the rather lengthy delays that occurred in this case. As we will set out in more detail herein, Johnson's first attorney was permitted to withdraw. A second attorney was appointed, and she too was permitted to withdraw from her representation of Johnson. Finally, the public defender was appointed on May 24, 1996, and the attorneys assigned to Johnson formally entered their appearances on June 7, 1996, some ten months after the events which gave' rise to the criminal charges. Johnson's trial took place July 22–24, 1996, and Judgment and Sentence were entered on July 26, 1996. A notice of appeal was filed that same day. An unusually large number of extensions were granted to the court reporter, who retired shortly after this trial was completed, and the transcript was not completed and the case not docketed in this Court until February 19, 1998. Appellant's Brief was filed on September 18, 1998, and Appellee's Brief was filed on January 22, 1999. The case was argued to this Court on March 18, 1999. After argument, supplemental briefs were filed on April 5, 20, and 26, 1999. The Court was unable to reach a consensus on its resolution of this case, as well as the companion case *Johnson v. State*, Case No. 99–320. In the interim, both Justices Thomas and Macy retired from active service with the Court. The Court requested additional briefing on the issues relating to equal protection and cruel and unusual punishment and additional argument was presented to the Court, as it is now constituted, on April 17, 2002.

4. The second count of child abuse arose because, in the course of conducting the autopsy, it was noted that the victim was recovering from another subdural hematoma that was in the process of healing, or "resolving itself," and it was alleged that Johnson had caused that injury during an earlier episode of bouncing the child on his knee.

cating a brain injury. The spinal fluid was "grossly"[5] bloody, also indicating a brain injury. An autopsy disclosed an intercranial hemorrhage. The bilateral hemorrhage and blood between the two hemispheres of the brain indicated findings consistent with shaken baby syndrome. The injuries had occurred at various times. The most recent injuries were the cause of death. The older injuries (one to two weeks old) were in the process of healing and would have resolved themselves over the course of time.

[¶ 6] Johnson did not testify in his own behalf. However, he gave several statements to investigating police officers, including one that was tape-recorded and played for the jury. Those statements, in their totality, told the following story, and are the principal sources of the evidence demonstrating Johnson's guilt. Initially, Johnson denied any knowledge of the cause of the infant's injuries. Later, he told the police and the treating physician that the infant awoke at 4:00 a.m., and that he tried to give him a bottle, but the infant sounded "weird." The feeding was unsuccessful and the baby soon shut his eyes. The baby was in his stroller and Johnson shook him to try to awaken him. At that point, the baby stopped breathing, and Johnson tried to awaken him with a slap on the cheek, but this did not revive the child either. When specifically confronted with the autopsy results that the infant died as a result of severe shaking, Johnson admitted to "bouncing" the infant up-and-down on his knee, sometimes harder and faster, in order to soothe the child and get him to stop crying. The pathologist who performed the autopsy testified that the cause of death was most likely an up-and-down shaking of the baby, but that some of the intercranial injuries were indicative of a side-to-side, rotational turning of the infant's head.

[¶ 7] With respect to the events of August 24th, Johnson said he bounced the infant for about five to seven minutes, which was about the amount of time it took to heat the baby's formula. The baby vomited, and Johnson noticed blood in the child's mouth and nose at about midnight. Although a friend previously told Johnson he was too rough with the child, Johnson claimed that he had never seen any blood in the past. Johnson used a doll to demonstrate to the police how he bounced the infant the morning of his death. In a thirty-second period, the officers counted ninety-one bounces, with Johnson never providing support for the doll's head.

[¶ 8] We will set out other facts pertinent to the particular issues in conjunction with our discussion of those issues.

## DISCUSSION

### Disqualification of District Attorney's Office

[¶ 9] From August 29, 1995, until the end of November of 1995, H. Steven Brown represented Johnson. Brown went to work for the Natrona County District Attorney's Office on December 1, 1995. Brown did not file a motion to withdraw as Johnson's counsel until January 16, 1996, and the motion was granted on January 18, 1996. In Brown's January 16, 1996 motion to withdraw, an appearance was entered by Virginia Hazen as Johnson's new counsel.

[¶ 10] Only three activities are shown in the record between November 29, 1995, and Hazen's withdrawal. First, a request for setting for a "COP," was filed by the State on January 8, 1996, and it was served on Jim Raymond, Brown's former law partner. It appears that "COP" means a change of plea hearing as provided for in W.R.Cr.P. 11(e). A hearing on that motion was scheduled for January 19, 1996. However, the record does not reflect that such a hearing took place. Second, Hazen filed a motion to compel discovery on March 27, 1996 (because the State had never responded to Brown's September 18, 1995 demand for discovery). At the same time, she requested that a hearing be set for that motion, as well as for motions previously filed by Brown in November, 1995 (the hearing was scheduled for April 19, 1996, but the

---

5. Although the word "grossly," as used in this context, was not further explained to the jury beyond its use by the physician witness, its meaning is that blood is observable by the naked eye (does not require microscopic examination to be identified). James L. Bennington, Ed., Saunders Dictionary and Encyclopedia of Laboratory Medicine and Technology 677 (1984); Webster's Third New International Dictionary 1002(1c) (1986).

record does not reflect that such a hearing took place). Third, on April 18, 1996, Hazen filed a motion for continuance, and that motion was granted by order entered on April 22, 1996. On April 23, 1996, Hazen filed a motion to withdraw as counsel for Johnson and requested appointment of a public defender. Hazen's motion to withdraw was denied by order entered on April 29, 1996. Hazen renewed her motion to withdraw on May 6, 1996, and filed bare-bones motions to disqualify Judge Sullins and to disqualify the entire Natrona County District Attorney's Office. The second motion to withdraw was granted by order entered on May 24, 1996, and the public defender was appointed to represent Johnson.

[¶ 11] It is necessary to digress momentarily. Before withdrawing as Johnson's attorney, Brown negotiated a plea agreement with the district attorney's office. The terms of that agreement, as set out in a letter dated November 29, 1995, from the district attorney to Brown were these:

> You [Brown] and I [Kevin Meenan] have discussed a settlement of this matter several times. I am willing at this time to extend the following offer to resolve this matter short of trial:
>
> 1. Your client is currently charged with one count of first degree felony murder and two counts felony child abuse;
>
> 2. The State of Wyoming would move to amend Count I (the felony murder) to a count of involuntary manslaughter charging that your client did unlawfully kill a human being, to wit: Thomas Johnson, without malice, expressed or implied, involuntarily but recklessly, in violation of W.S. § 6–2–105. In exchange for a plea of guilty to that amended count, the State would also move to dismiss Counts II and III.
>
> 3. The State would join with the Defendant in a recommended sentence to the Court that Mr. Johnson be sentenced to the Wyoming State Penitentiary for a term of not less than seven nor more than ten years. That prison term would be suspended, your client placed on a period of supervised probation for the minimum seven years on the condition that he successfully complete three years at the CAC program.
>
> 4. Additionally, your client would successfully complete any and all counseling, alcohol, child abuse treatment, or other usual conditions of probation.
>
> 5. This offer is premised on the assumption that your client has no prior felony offenses. If he has previously been convicted of a felony, then the offer is withdrawn.
>
> Given the physical evidence in this case, the fact that the death of Thomas did appear to come about by criminal recklessness rather than an anger-driven assault, and the lack of any prior criminal offenses by your client, I believe this disposition to be fair and appropriate.
>
> If you and your client agree with this proposed disposition, please sign in the indicated portions below. I understand that another lawyer from your firm will be present with Mr. Johnson at the change of plea which we will schedule later in the month of December.

[¶ 12] That agreement was signed by Johnson and Attorney Brown as "APPROVED AND ACCEPTED." However, the record does not reflect that a change of plea proceeding ever materialized, and, of course, Brown left his defense of Johnson and began working for the district attorney two days after the letter was signed. Although there is no corresponding transcript, by order entered on January 23, 1996, the district court indicated that Johnson and his counsel appeared before him, and it was the trial court's determination that a presentence investigation should be completed, even though no plea had been entered which would trigger such a request. Other than ordering a presentence investigation, none of the procedures governing plea agreements were followed. W.R.Cr.P. 11(e).

[¶ 13] A presentence investigation was completed and filed with the district court on February 27, 1996.[6] By letter dated Febru-

---

6. The presentence investigation became an issue at trial because the district attorney wanted to

use any statements made by Johnson to the preparer of that report as evidence against Johnson

ary 27, 1996, the district court informed counsel for the parties of this:

> Based upon my current review of the Plea Agreement Letter that was provided to me in connection with the referenced case, I would advise that I would reject the proposed plea agreement. I would be willing to accept the proposed amendment of the charges in the case to a charge of involuntary manslaughter under Wyo. Stat.1977, as amended, Section 6–2–105, but feel I must reject the proposed joint recommendation for sentencing.

[¶ 14] Exactly what happened to that plea agreement is not reflected in the record. The closest we get to some sense of what might have happened is during an exchange between the trial court and Johnson that occurred when Hazen was permitted to withdraw as Johnson's attorney and the public defender was appointed. It went like this:

> THE COURT: You understand that obviously this is a most difficult case for any attorney. In part, that may be a good reason to allow you to, with a new attorney, have a fresh start?
>
> THE DEFENDANT: Yes.
>
> THE COURT: Is that part of your thinking and your reasoning in wanting a switch?
>
> THE DEFENDANT: No, not a new start, just some way to get fairness. The way I feel it would be fair—
>
> (Discussion held off the record between Miss Hazen and the Defendant.)
>
> THE DEFENDANT: It is my desire to go to trial rather than plead guilty to charges that—
>
> THE COURT: And you have that right under the law.

[¶ 15] Against this backdrop, on June 19, 1996, Johnson's new attorneys filed a comprehensive motion asking that the district court disqualify the entire Natrona County District Attorney's Office because the attorney who had initially represented Johnson had withdrawn as his counsel in order to accept employment with the district attorney. Both the district attorney's office and Brown took some precautions to ensure that Brown would not have any further contact with Johnson's case. Brown informed Johnson in November 1995, about his change of office. The district attorney verbally informed Brown to have "no access to the file, that if there's any meetings or anything, standard procedures, then no one else [was] to raise it while I'm there. I have to leave the room." Nobody attempted to discuss the case with him, nor did he approach anyone in the office or divulge information about the case. Brown left the courtroom when the case was called during docket call. He further explained that any discussion about Johnson was placed at the end of the Friday morning staff meeting agenda and when Johnson's name was called, he left the room.

[¶ 16] Further, Brown testified that he never revealed confidential matters to the district attorney, even while negotiating for his position at the district attorney's office. When he learned of his new position, he withdrew, the court appointed another attorney, and he provided her all the original records which he never copied. The new attorney then met privately with Johnson, although Brown did indicate that he may have attended a Saturday meeting between Johnson and Hazen after joining the district attorney's staff. Although Brown did not withdraw immediately from Johnson's case when starting his employment at the district attorney's office, the plea agreement had been worked out previously, and he was waiting for a hearing in front of the judge to finalize it.[7]

---

in its case in chief. The trial court allowed the district attorney to have a copy of the report, but it was clear that he was not going to allow the actual report itself to be admitted in evidence.

7. The district attorney was going to testify at this hearing also, but he was unavailable when Brown finished his telephonic testimony. There was a general agreement by both the prosecutor and defense counsel that the trial court had enough information to decide the issue. From this Court's perspective, had the district attorney made himself available to testify, such testimony might have served to ease the residual concerns this Court has as to whether the district attorney was aware of the rather serious questions this matter precipitated.

■ [¶ 17] Johnson maintains that the district court abused its discretion in refusing to disqualify the entire Natrona County District Attorney's Office. As an issue of first impression in Wyoming, we turn to other jurisdictions for guidance.

[¶ 18] The proceedings outlined above are, indeed, quite unusual and understandably raise serious questions about the handling of Johnson's case at a crucial stage of the proceedings. However, we hasten to add that the only issue raised with regard to these circumstances, is whether or not the trial court abused its discretion in denying Johnson's motion to disqualify the entire Natrona County District Attorney's Office. Johnson's contention is that the appearance of impropriety is so great that it is error *per se,* and reversal of Johnson's conviction is mandated. He also contends that even under a case-by-case evaluation approach, the appearance of impropriety demonstrated here is so great as to require reversal.

■ [¶ 19] As the first step in providing guidance to trial courts in handling such a question, we will adopt the standard that a trial court has substantial latitude in deciding if counsel must be disqualified. *See United States v. Frega,* 179 F.3d 793, 799 (9th Cir. 1999) (*citing United States v. Stites,* 56 F.3d 1020, 1024 (9th Cir.1995)). We decline to adopt an "appearance of impropriety" standard and adopt instead a "function approach," which focuses on preserving confidentiality and avoiding positions adverse to the client. *See State v. Dimaplas,* 267 Kan. 65, 978 P.2d 891, 893–94 (1999). We are persuaded that much more needs to be done in future cases where such a conflict as that identified above arises, but we will set down no bright-line rules. Utilizing the standards adopted above, we hold that Johnson was not substantially prejudiced by the Natrona County district attorney's handling of adding Brown to his staff, however ill-considered it might appear on the surface. We are satisfied that Brown's testimony was frank and

direct and that his personal efforts to ensure that no prejudice would result to his former client outbalance any lack of attention to this vital issue. From the case, *Matter of R.B.,* 583 N.W.2d 839, 841–42 (S.D.1998), we have distilled the following additional guidelines, which must be followed in future cases:

1. Oral and written directions must be given to all staff members that the attorney will not participate in any matter in which the attorney participated as a public defender or criminal defense attorney. A written screening policy must be put in place to ensure this requirement is met.

2. A letter should be directed to every former client of the attorney announcing the new employment relationship. This letter may be sent to the client, care of the client's current attorney. Ideally, this letter should appear in the court record of an affected criminal case.

3. The prosecuting attorney's screening policy should be sent to every judge in the district, circuit, and/or county affected.

4. A copy of the screening policy should be placed in every active case file in which the attorney participated.

5. All office employees should be advised both orally and in writing that any violation of the screening process must be reported immediately and that inattention to the screening policy will result in discipline.

6. In a prominent location near case files, post a list of all cases from which the attorney is to be screened.

[¶ 20] These, or comparable procedures, should remain in place until the need for them has passed.[8]

[¶ 21] In addition, prosecuting attorneys should be familiar, or as necessary become familiar, with applicable ABA standards relating to the prosecution function, as well as with pertinent case law, as may be required by circumstances such as those which arose here. Ignorance of the law is no less a

---

**8.** Obviously, there will be a need to "improvise" based on local conditions. A procedure such as that set out above should suffice in most large prosecuting attorneys' offices. We are aware that there are prosecutorial offices where there is only a single prosecutor and many may be no larger than two or three persons. Two universal guidelines should apply: (1) The essential goal is to avoid actual conflicts, as well as the appearance of impropriety; and (2) the record should clearly reflect what precautions were used to attain that goal.

defense for a prosecuting attorney than it is for a criminal defendant.

### Equal Protection—Felony Murder v. Child Abuse

[¶ 22] Johnson was charged with first degree felony murder in violation of Wyo. Stat. Ann. § 6-2-101 (Michie 1994)[9]. That statute provided:

> (a) Whoever purposely and with premeditated malice, or in the perpetration of, or attempt to perpetrate, any sexual assault, arson, robbery, burglary, escape, resisting arrest, kidnapping or abuse of a child under the age of sixteen (16) years, kills any human being is guilty of murder in the first degree.

The circumstance that enhanced Johnson's crime to felony murder was child abuse of a child under the age of 16. Child abuse is a crime that is defined by Wyo. Stat. Ann. § 6-2-503 (Michie 1988 and Supp.1995). That statute provided:

> (a) Except under circumstances constituting a violation of W.S. 6-2-502[10], a person is guilty of child abuse, a felony punishable by imprisonment for not more than five (5) years, if:
>
> (i) The actor is an adult or is at least six (6) years older than the victim; and
>
> (ii) The actor intentionally or recklessly inflicts upon a child under the age of sixteen (16) years:
>
> (A) Physical injury as defined in W.S. 14-3-202(a)(ii)(B); or
>
> (B) Mental injury as defined in W.S. 14-3-202(a)(ii)(A). [Footnote added]

[¶ 23] In this instance, it was alleged that Johnson inflicted physical injury, as defined in Wyo. Stat. Ann. § 14-3-202(a)(ii)(B) (Michie 1994 and Supp.1995) (emphasis added):[11]

> (a) As used in W.S. 14-3-201 through 14-3-215:

. . . .

> (ii) "Abuse" with respect to a disabled adult means as defined under W.S. 35-20-102(a)(ii). "Abuse" with respect to a child means inflicting or causing physical or mental injury, harm or imminent danger to the physical or mental health or welfare of a child other than by accidental means, including abandonment, excessive or unreasonable corporal punishment, malnutrition or substantial risk thereof by reason of intentional or unintentional neglect, and the commission or allowing the commission of a sexual offense against a child as defined by law:

. . . .

> (B) "Physical injury" means **death** or any harm to a child including but not limited to disfigurement, impairment of any bodily organ, skin bruising, bleeding, burns, fracture of any bone, subdural hematoma or substantial malnutrition[.]

[¶ 24] In his supplemental brief, Johnson calls our attention to a 2002 amendment to § 14-3-202(a)(ii)(B). That statute now reads:

> (B) "Physical injury" means any harm to a child including but not limited to disfigurement, impairment of any bodily organ, skin bruising if greater in magnitude than minor bruising associated with reasonable corporal punishment, bleeding, burns, fracture of any bone, subdural hematoma or substantial malnutrition;

2002 Wyo. Sess. Laws Ch. 89, § 1. Although several other changes were made to that definition, some which may also create some troubling circumstances,[12] of special importance to this decision the Legislature deleted the word "death."

[¶ 25] Johnson contends that a person who commits a criminal act such as he did, could be punished under either of these

---

9. This statute has been subsequently amended.

10. Aggravated assault and battery.

11. This statute has been subsequently amended.

12. The language, "skin bruising if greater in magnitude than minor bruising associated with reasonable corporal punishment," may pose some significant difficulties in the prosecution of crimes arising under this statute. The legislature may wish to take a closer look at its work in this regard.

two statutes, *i.e.*, they punish virtually identical conduct in two very disparate ways. Johnson contends that such a statutory construct violates equal protection under the Wyoming Constitution, as well as the principle that if the statutes do punish identical conduct, we must construe them in a way most favorable to a criminal defendant, *i.e.*, the rule of lenity. Johnson relies, in significant part, on the case *Small v. State*, 689 P.2d 420, 425 (Wyo.1984), wherein this Court, in dicta, stated that it did "not disagree with appellant that wherever two or more statutes provide different punishment for exactly the same criminal conduct, equal protection is violated." Indeed, the case this Court cited for that proposition also gave recognition to that same rule in dicta. *People v. Hulse*, 192 Colo. 302, 557 P.2d 1205, 1206 (1976).

[¶ 26] However, our decision in *Small*, and many of the cases which embrace the sentiments expressed in the sentence quoted above, do not fully take into account the decision of the United States Supreme Court in *United States v. Batchelder*, 442 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979). In that case the Supreme Court considered two overlapping provisions of the Omnibus Crime Control and Safe Streets Act of 1968. Both provisions prohibited convicted felons from possessing firearms, but one provision imposed only a two-year maximum penalty, whereas the second imposed a maximum penalty of five years. *Batchelder*, 99 S.Ct. at 2200. Batchelder was tried, convicted, and sentenced under the statute that provided the five-year maximum sentence (Batchelder was given the maximum sentence). The Seventh Circuit Court of Appeals affirmed the conviction, but remanded for resentencing under the more lenient statute, relying on three principles: (1) The arguably contradictory penalty provisions and inconclusive legislative history raised doubt whether Congress intended the two penalties to co-exist, and the ambiguity should be resolved in favor of the defendant; (2) the more lenient statute was Congress's last word on the subject, and it may have implicitly repealed the more severe penalty; and, (3) the statutes needed to be construed so as to avoid constitutional questions, and the prosecutor's power to select one of two identical statutes implicated important constitutional questions. 99 S.Ct. at 2200–1. Reversing the circuit court's decision, the Supreme Court initially determined that each of the two statutes operated independently of the other. It also found that the legislative history confirmed that Congress intended to do just what it had done, even though it acted at the "last minute,"·the legislation was "hastily passed," and the entire Congress apparently relied on the oral statement of a single senator that the legislation would take nothing away from, but merely add to, the existing legislation. That material, the Supreme Court found, evinced Congress's "clear understanding" that the two Titles would operate independently. 99 S.Ct. at 2201–02. The Supreme Court held that the Seventh Circuit could not rely on ambiguity because none existed, and it declined to manufacture ambiguity. 99 S.Ct. at 2203. It also held that the Seventh Circuit could not rely on implied repeal because the legislative intent to repeal must be manifest in the positive repugnancy between the two provisions ("In this case, however, the penalty provisions are fully capable of co-existing because they apply to convictions under different statutes."). 99 S.Ct. at 2203 Finally, the Supreme Court held that the maxim that statutes should be construed to avoid constitutional questions offered "no assistance" because it was not "fairly possible" to construe the "five" in the more severe statute to mean "two." 99 S.Ct. at 2203. The reasoning of the Supreme Court focused on this set of issues:

> In resolving the statutory question, the majority below expressed "serious doubts about the constitutionality of two statutes that provide different penalties for identical conduct." ... Specifically, the court suggested that the statutes might (1) be void for vagueness, (2) implicate "due process and equal protection interest[s] in avoiding excessive prosecutorial discretion and in obtaining equal justice," and (3) constitute an impermissible delegation of congressional authority.

*Batchelder*, 99 S.Ct. at 2203.

[¶ 27] The Supreme Court then answered each of those concerns seriatim. As to ambiguity, "[a]lthough the statutes create uncer-

tainty as to which crime may be charged and therefore what penalties may be imposed, they do so to no greater extent than would a single statute authorizing various alternative punishments. So long as overlapping criminal provisions clearly define the conduct prohibited and the punishment authorized, the notice requirements of the Due Process Clause are satisfied." *Batchelder*, 99 S.Ct. at 2204.

[¶ 28]   As to equal protection, it held that "when an act violates more than one criminal statute, the Government may prosecute under either so long as it does not discriminate against any class of defendants." *Batchelder*, 99 S.Ct. at 2204. The Supreme Court did not agree with the circuit court's characterization of these statutes as creating "unfettered" discretion in the prosecutor. Prosecutorial discretion, the Supreme Court opined, is subject to constitutional constraints (*e.g.*, no selective enforcement based upon an unjustifiable standard such as race, religion, or other arbitrary classification.). 99 S.Ct. at 2205. Continuing, the Supreme Court held:

> More importantly, there is no appreciable difference between the discretion a prosecutor exercises when deciding whether to charge under one of two statutes with different elements and the discretion he exercises when choosing one of two statutes with identical elements. In the former situation, once he determines that the proof will support conviction under either statute, his decision is indistinguishable from the one he faces in the latter context. The prosecutor may be influenced by the penalties available upon conviction, but this fact, standing alone, does not give rise to a violation of the Equal Protection or Due Process Clause.... Just as a defendant has no constitutional right to elect which of two applicable federal statutes shall be the basis of his indictment and prosecution, neither is he entitled to choose the penalty scheme under which he will be sentenced.

*Batchelder*, 99 S.Ct. at 2205.

[¶ 29]   As to any problems relating to an excessive delegation, the Court held:

> The provisions at issue plainly demarcate the range of penalties that prosecutors and judges may seek and impose. In light of that specificity, the power that Congress has delegated to those officials is no broader than the authority they routinely exercise in enforcing the criminal laws. Having informed the courts, prosecutors, and defendants of the permissible punishment alternatives available under each Title, Congress has fulfilled its duty.

*Batchelder*, 99 S.Ct. at 2205.

[¶ 30]   In their treatise on criminal procedure, Professors LaFave, Israel, and King have this to say about the *Batchelder* decision:

> In assaying the *Batchelder* reasoning, it is useful to think about three types of situations in which a defendant's conduct may fall within two statutes. They are: (1) where one statute defines a lesser included offense of the other and they carry different penalties (e.g., whoever carries a concealed weapon is guilty of a misdemeanor; a convicted felon who carries a concealed weapon is guilty of a felony); (2) where the statutes overlap and carry different penalties (e.g., possession of a gun by a convicted felon, illegal alien or dishonorably discharged serviceman is a misdemeanor; possession of a gun by a convicted felon, fugitive from justice, or unlawful user of narcotics is a felony); (3) where the statutes are identical (e.g., possession of a gun by a convicted felon is a misdemeanor; possession of a gun by a convicted felon is a felony). The Court in *Batchelder* had before it a situation falling into the second category, but seems to have concluded that the three statutory schemes are indistinguishable for purposes of constitutional analysis. But in terms of either the difficulties which are confronted at the legislative level in drafting statutes or in the guidance which is given to a prosecutor by the legislation, the three schemes are markedly different.
>
> The first of the three is certainly unobjectionable. Such provisions are quite common (robbery-armed robbery; battery-aggravated battery; joyriding-theft; housebreaking-burglary), and usually are a consequence of a deliberate attempt by the legislature to identify one or more aggra-

vating characteristics which in the judgment of the legislature should ordinarily be viewed as making the lesser crime more serious. They afford guidance to the prosecutor, but—as noted in *Batchelder*—do not foreclose the prosecutor from deciding in a particular case that, notwithstanding the presence of one of the aggravating facts, the defendant will still be prosecuted for the lesser offense.

By contrast, the third of the three is highly objectionable. It is likely to be a consequence of legislative carelessness, and even if it is not such a scheme serves no legitimate purpose. There is nothing at all rational about this kind of statutory scheme, as it provides for different penalties without any effort whatsoever to explain a basis for the difference. It cannot be explained in terms of giving assistance to the prosecutor. "Where statutes are identical except for punishment, the prosecutor finds not the slightest shred of guidance." It confers discretion which is totally unfettered and which is totally unnecessary. And thus the Court in *Batchelder* is less than convincing in reasoning that this third category is unobjectionable simply because in other instances, falling into the first category, the need for discretionary judgments by the prosecutor has not been and cannot be totally eliminated.

As for the second of the three categories, it clearly presents a harder case. Here as well, the dilemma is likely to have been created by legislative carelessness . . . overlapping statutes are very common at both the federal and state level, and it can hardly be said that in every instance they are a consequence of poor research or inept drafting. Drafting a clear criminal statute and still ensuring that in *no* instance could it cover conduct embraced within any existing criminal statute in that jurisdiction can be a formidable task. (This fact alone may make courts somewhat reluctant to find overlap per se unconstitutional, although the consequence of such a finding, limiting punishment to that under the lesser of the two statutes until such time as the legislature decides what to do about the now-identified overlap, is

hardly a cause for alarm.) Moreover, in the overlap scheme the two statutes will at least *sometimes* assist the prosecutor in deciding how to exercise his charging discretion.

4 Wayne R. LaFave, Jerold H. Israel, and Nancy J. King, *Criminal Procedure* § 13.7(a), 95–97 (1999 and Supp.2002) (emphasis in original).

[¶ 31] The professors do not speculate as to whether or not more dramatic disparities between the sentences allowed or required under the two such statutes will make a difference, but their treatise suggests that some measure must be taken of that factor. The professors do note the effect such statutes have on judicial discretion in sentencing, often virtually tying the trial court's hands in that regard. 4 LaFave, Israel & King, *Criminal Practice & Procedure* § 13.7(a) at 98. Clearly, that is the case here where in the case of the lesser crime the maximum sentence is five years, whereas in the case of the greater the sentence is a mandatory life sentence and possible execution by lethal injection. Continuing their discussion, the professors opine:

Prior to the *Batchelder* decision, some states held unconstitutional statutes which provided different punishment for exactly the same conduct. Some of the decisions went so far as to also cover criminal statutes which merely overlapped with one another. Though the reasoning in these cases was often similar to that found wanting in *Batchelder,* meaning that decision has created some chance that the courts so holding will retreat from their earlier position, there is no reason why this must be the case. Notwithstanding *Batchelder,* a state might well conclude as a matter of state constitutional law that "equal protection of the laws requires that statutory classification of crimes be based on differences that are real in fact and reasonably related to the general purposes of criminal legislation," and that such protection is lacking "if different statutes proscribe the same criminal conduct with disparate criminal sanctions." And of course there remains open the possibility that a court will be able to avoid the problem entirely by

utilizing canons of statutory construction, such as that a later statute should prevail over the earlier one with which it would otherwise overlap, or that the more specific statute should prevail over the more general one with which it would otherwise overlap.

4 LaFave, Israel & King, *supra*, at 98–99; *and see* Comment, Martin H. Tish, *Duplicative Statutes, Prosecutorial Discretion, and the Illinois Armed Violence Statute*, 71 Journal of Crim. Law & Criminology 226 (1980); *Hart v. State*, 702 P.2d 651, 659–63 (Alaska App.1985); *State v. Cissell*, 127 Wis.2d 205, 378 N.W.2d 691, 693–98, 701–4 (dissenting opinion) (Wis.1985); *State v. Pickering*, 462 A.2d 1151, 1157–63, 1163–66 (concurring and dissenting opinions) (Me.1983).

[¶ 32] In spite of what we said in *Small*, we have specifically recognized that overlapping statutes do not violate due process principles. In so holding, we have embraced the United States Supreme Court's decision in *Batchelder*. *Worcester v. State*, 2001 WY 82, ¶ 26, 30 P.3d 47, ¶ 26 (Wyo. 2001); *Duffy v. State*, 789 P.2d 821, 826 (Wyo.1990); *Nowack v. State*, 774 P.2d 561, 563–65 (Wyo.1989); *Bueno–Hernandez v. State*, 724 P.2d 1132, 1140 (Wyo.1986); *Kallas v. State*, 704 P.2d 693, 694–95 (Wyo.1985); *also see Capwell v. State*, 686 P.2d 1148, 1153 (Wyo.1984). These decisions have not specifically employed an equal protection analysis, but our acceptance of the *Batchelder* reasoning appears to extend to the entire range of its holdings.

[¶ 33] We deem it prudent at this juncture to concede that the issues Johnson raises in this regard have been decided against him by the United States Supreme Court on the basis of his federal constitutional claims. Many of our sister jurisdictions have done so, as well. *See, e.g., State v. Santillanes*, 2001–NMSC–018, ¶¶ 26–27, 130 N.M. 464, 27 P.3d 456, ¶¶ 26–27 (2001); *State v. Larsen*, 135 Idaho 754, 24 P.3d 702, 705–6 (2001); *State v. Payan*, 132 Idaho 614, 977 P.2d 228, 230–32 (1998); *State v. Eakins*, 73 Wash.App. 271, 869 P.2d 83, 84–86 (Div. 2, 1994). However, Johnson asks that we review these matters under our own similar, but not identical, state constitutional provi-

sions. Article 1, § 2, of the Wyoming Constitution provides: "In their inherent right to life, liberty and the pursuit of happiness, all members of the human race are equal." Article 1, § 34 provides: "All laws of a general nature shall have a uniform operation." We have held that this latter section is most similar to the federal constitution's equal protection provisions, though because our constitution speaks in terms of uniform operation we have found it more "adaptable," than the phrase "equal protection." *See Washakie County School District No. 1 v. Herschler*, 606 P.2d 310, 320 n. 10 (Wyo. 1980); and *Nehring v. Russell*, 582 P.2d 67, 77 (Wyo.1978). Likewise, we have recognized that the holdings of the United States Supreme Court are in many instances merely floors that we cannot go beneath, and our state constitution may, in at least some circumstances, provide greater rights than does the federal constitution.

[¶ 34] Although Johnson's argument is cogent, he has not been able to provide us with direct authority to support it. In our research, we have found no precedents that convince us we should regard our state constitution as providing greater rights than those identified by the United States Supreme Court in *Batchelder*. Although there is little, if any, concrete evidence of legislative intent, we are persuaded that the legislature intended to do exactly what it did. We are also convinced that the 1994 amendment to the first degree murder statute gave fair warning to all citizens that if a child died as the result of abuse, then one of the potential penalties is life in prison or execution. The amendment that was passed in 2002 helps achieve additional clarity in this area of the law, but it did not serve to remove an ambiguity that we would be required to resolve in favor of a criminal defendant. When an individual takes a life, or otherwise causes the death of another person, all statutes that deal with homicide, from first degree murder down to child abuse, may have potential application. Therefore we hold that the prosecution of Johnson for felony murder did not violate his constitutional right to equal protection of the law as that principle is articulated in the Wyoming Constitution.

### Cruel and Unusual Punishment

[¶ 35] Article 1; § 14 of the Wyoming Constitution provides: "All persons shall be bailable by sufficient sureties, except for capital offenses when the proof is evident or the presumption great. Excessive bail shall not be required, nor excessive fines imposed, nor shall **cruel or unusual** punishment be inflicted." (Emphasis added.) The Eighth Amendment to the United States Constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor **cruel and unusual** punishments inflicted." (Emphasis added.) Our state constitution articulates the standard in the disjunctive and the federal constitution in the conjunctive. We have at least tacitly recognized that under our state constitution we will look at the two words individually. *Sampsell v. State,* 2001 WY 12, ¶¶ 10–11, 17 P.3d 724 ¶¶ 10–11 (Wyo.2001). First, is the punishment cruel? We can answer that question quite simply and directly—a life sentence in prison is not cruel, in and of itself. The second question is whether it is unusual. In a semantic sense, it is unusual in that the life sentence is reserved for only a few very serious crimes or for persons who have habitually committed violent criminal acts. Johnson's contention is more to the point that his sentence is unusual because not many people who commit a crime such as he did are sentenced to life in prison and, of course, if the child abuse statute is considered in isolation, it is unusual to get a life sentence for a crime that is also defined in the statutes as a felony carrying only a five-year maximum sentence.

[¶ 36] We are unable to accept Johnson's reasoning in this regard. While not all persons whose homicide victims are children receive life sentences, our cursory review of case law revealed sentences that range from death to probation. *See, e.g., State v. Godsey,* 60 S.W.3d 759, 787–93 (Tenn.2001) (collecting cases). We hold that a life sentence for causing the death of a child is not an unusual sentence.

[¶ 37] Johnson does not cite to us pertinent authority to support his contention that the punishment imposed in this case, a life sentence, is cruel and unusual punishment. The focus of his argument is that it is "unusual" because Wyoming's statutory scheme with respect to this particular crime is apparently unique. We comprehend his argument and consider it cogent, but we are not persuaded that it is correct. The imposition of a life sentence for a homicide is a time honored and entirely humane method of punishing that crime. Wyo. Stat. Ann. §§ 6–2–101(b) and 6–2–104 (LexisNexis 2001) (and see the statutory history of those two crimes throughout Wyoming's history as a Territory and a State). A wide range of punishments might well be imposed in cases involving child abuse homicide, anything from death to a direction that a verdict of innocence be entered on remand after appeal. The cases are very fact sensitive. *See, e.g., Lukehart v. State,* 776 So.2d 906, 925–26 (Fla.2000) (death penalty not too severe where defendant killed child and had been convicted of child abuse for shaking baby once before); *State v. Mott,* 187 Ariz. 536, 931 P.2d 1046, 1057 (1997) (35 years without possibility of parole not cruel and unusual); *State v. O'Blasney,* 297 N.W.2d 797, 802 (S.D.1980) (49 years and ten months not cruel and unusual where defendant intentionally dropped infant to the floor of the bathroom); and *Hermanson v. State,* 604 So.2d 775, 780 (Fla.1992) (trial court ordered to enter verdict of innocent where parents failed to seek medical treatment because of religious beliefs; parents convicted of third-degree murder).

### Errors in Instructions

[¶ 38] The standard for assessing such a claim of error is well-established. Jury instructions should inform the jury concerning the applicable law so that they can apply that law to their findings with respect to the material facts; instructions should be written with the particular facts and legal theories of each case in mind and often differ from case to case since any one of several instructional options may be legally correct; a failure to give an instruction on an essential element of a criminal offense is fundamental error, as is a confusing or misleading instruction; the test whether a jury has been properly instructed on the necessary elements of

a crime is whether the instructions leave no doubt as to the circumstances under which the crime can be found to have been committed. *Compton v. State*, 931 P.2d 936, 939–40 (Wyo.1997) (citing *Miller v. State*, 904 P.2d 344, 348 (Wyo.1995)).

[¶ 39] In arguments IV and VII, Johnson asserts several errors in the instructions given the jury by the trial court. The focus of Johnson's arguments is the failure of the trial court to give adequate instructions with respect to specific intent in the context of this case. The trial court did give the following instructions:

> YOU ARE INSTRUCTED that as used in Instruction Nos. 8 and 9 the term "intentionally" means the prohibited conduct was undertaken voluntarily, without legal justification or excuse.

> YOU ARE INSTRUCTED that "recklessly" is defined as the following conduct: A person acts recklessly when he consciously disregards a substantial and unjustifiable risk that the harm he is accused of causing will occur, and the harm results. The risk shall be of such nature and degree that disregarding it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.

> YOU ARE INSTRUCTED that to prove the crimes charged in this case, it is not necessary to establish a deliberate intent to kill or any other specific intent on the part of the Defendant. The crimes charged in this case are general intent offenses whereunder it is sufficient to demonstrate that the defendant undertook the prohibited conduct voluntarily, and his purpose in pursuing that conduct is not an element of the crimes.

[¶ 40] Johnson offered, and presented argument in support of, the following instructions in place of those given by the trial court:

> YOU ARE INSTRUCTED that a person acts with intent when it is his conscious objective or desire to engage in conduct or to cause the result.

> Criminal intent is a necessary ingredient of criminal liability, and one charged with criminal conduct must have an awareness or consciousness of wrongdoing.

> Basic premise of criminal liability is that act alone does not make one guilty unless his mind is also guilty.

> YOU ARE INSTRUCTED that the necessary elements of the crime of 1st degree murder, you must find from your consideration of all the evidence the following elements:

> 1. That on or about the 24th day of April [August], 1995, while within Natrona County, State of Wyoming;

> 2. The Defendant, Daniel Johnson did in the perpetration of, or attempt to perpetrate the abuse of a child under the age of sixteen (16) years;

> 3. With the intent to inflict physical injury on a child;

> 4. Kill a human being;

> 5. Is guilty of murder in the first degree.

> If you find from your consideration of all the evidence that any of these elements has not been proven beyond a reasonable doubt, then you should find the defendant not guilty.

> If, on the other hand, you find from your consideration of all the evidence that each of these elements has been proven beyond a reasonable doubt, then you should find the Defendant guilty.

> YOU ARE INSTRUCTED [that] to constitute the crime charged there must be a union of two essential elements, an act forbidden by law and a specific intent.

> Specific intent means more than the general intent to commit the act. To prove a crime which involves specific intent, the prosecution must prove beyond a reasonable doubt:

> (1) That the defendant did the act charged, and

> (2) That he did it with the specific intent described in the crime charged.

> The specific intent in the crime charged, felony murder, is the intent to commit child abuse, and must be proved beyond a reasonable doubt as any other fact in the case; as cited in *Jansen v. State*, 892 P.2d 1131, 1138 (Wyo.1995).

The crime charged in this case, felony murder, is a serious crime which requires proof of specific intent before the defendant can be convicted. Specific intent, as the term implies, means more than the general intent to commit the act. To establish specific intent, the state must prove that the Defendant knowingly perpetrated or attempted to perpetrate abuse upon a child, specifically intending to violate the law. Such intent may be determined from all the facts and circumstances surrounding the case.

An act or a failure to act "knowingly" done, if done voluntarily and intentionally, and not because of mistake or accident or other innocent reason.

[¶ 41] A comparison of the instructions given with those requested by Johnson convinces us that refusal of the offered instructions was not error. The instructions offered by Johnson are not necessarily incorrect; indeed, they may have been an improvement on those given. However, as given, the instructions did not run afoul of the standard of review that we apply in such circumstances as these.

[¶ 42] Johnson also contends that the instructions, as given, offered the jury two separate theories upon which the Defendant's guilt could be based—intentionally and recklessly. We have recognized that a general verdict must be reversed when the verdict is supportable on one ground but not on the other and when it is impossible to ascertain which ground the jury relied upon in reaching its verdict, but reversal is not required when sufficient evidence supports each alternative ground. *See Bloomquist v. State,* 914 P.2d 812, 819 (Wyo.1996). We conclude that the State produced sufficient evidence to support both the allegations that Johnson's acts were intentional and reckless.

### Other Issues

[¶ 43] There are two additional issues raised by Johnson, and we will comment on them only briefly. Johnson was not present when the Court and counsel considered a question from the jury. That question was: "Does death by child abuse equal 1st degree murder? If it does, then why is it that if we decide guilty of child abuse it does *not* automatically equal first degree murder or should the murder/death be considered a lesser charge? (Can it?)." In many circumstances it is a requirement that a criminal defendant be present for jury question procedures such as that which occurred here. There are, of course, exceptions, but there is no bright line, and doubt should be resolved in favor of the defendant's presence.[13] *See* Wyo. Stat. Ann. § 7–11–202 (LEXIS 1999); and *Seeley v. State,* 959 P.2d 170, 177–79 (Wyo.1998). The trial court stated on the record, and before the jury, that Johnson was not present because his presence was not requested and because the question to be answered was purely a legal/procedural matter. Defense counsel did not interpose any objection to Johnson's absence. Under these circumstances, we conclude that Johnson's absence was not reversible error. Moreover, to the extent any error might be conjured up from the circumstances, we most certainly perceive it to be harmless. *Seeley,* 959 P.2d at 177–79.

[¶ 44] Johnson also claims that the prosecutor improperly commented on his right to remain silent. That comment was:

Now Mr. Johnson obviously didn't want to tell the police much of anything. That is another indication that we have that he knew what he did was wrong. If he didn't know what he did was wrong, he probably wouldn't have had no reservation and those fears about disclosing to the police what Officer Jones talked about.

[¶ 45] The State contends that this comment was fair argument in the light of Johnson's decision to talk with the police and then telling several conflicting stories. Johnson exhorts us to review this excerpt from the argument under a variety of standards of

**13.** Since a defendant is required to object to any instruction given to the jury in order to preserve error, the defendant should always be permitted to be present. W.R.Cr.P. 30. Any waiver should clearly appear in the record. Any other course suggests that a defendant may play no role in the defense of his criminal case. Though that likelihood may be insubstantial in some cases, there should be no presumption that it is always insubstantial.

review, which may be applied to the prosecution's comment on the right to remain silent. However, we are able to readily conclude from the record that the comment, in context, was a comment on statements Johnson *did* make (*i.e.,* the exercise of his right to speak freely and voluntarily if he so chose), and we conclude that discussion of the asserted error in the context of a violation of the right to remain silent is not necessary.

[¶ 46] The Judgment and Sentence of the trial court is affirmed in all respects.

HILL, C.J., delivered the opinion of the Court; LEHMAN, J., filed a dissenting opinion in which GOLDEN, J., joins.

LEHMAN, Justice, dissenting, with whom GOLDEN, Justice, joins.

[¶ 47] The majority holds that the statutory scheme at issue in this case presents no constitutional problems. I cannot agree and must therefore respectfully dissent. I would hold that the ability to charge a person for the exact same conduct under two different statutes with two vastly different punishments violates equal protection as afforded by both the Wyoming Constitution and the United States Constitution.

[¶ 48] Generally, equal protection is thought to prevent the government from making classifications in the law based on impermissible standards. Yet, equal protection also forbids the arbitrary application of the law. For instance, selective enforcement based on unjustifiable standards such as race, religion, or other arbitrary classification is prohibited by equal protection. *Oyler v. Boles,* 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1962). We have said: "Equal protection 'mandates that all persons similarly situated shall be treated alike, both in the privileges conferred and in the liabilities imposed.' " *Allhusen v. State, by and through Mental Health Professions Licensing Bd.,* 898 P.2d 878, 884 (Wyo.1995) (quoting *Small v. State,* 689, P.2d 420, 425 (Wyo.1984)). The statutes at issue in this case make no improper classification on their face. Rather, the danger in this instance is the possible arbitrary or capricious application of the statutes.

[¶ 49] The Wyoming Constitution provides: "In their inherent right to life, liberty and the pursuit of happiness, all members of the human race are equal." Art. 1, § 2. The Wyoming Constitution further provides that: "All laws of a general nature shall have a uniform operation." Art. 1, § 34. These two provisions combine to afford citizens equal protection under the law. "Equal protection guarantees that similar people will be dealt with similarly and that people in different circumstances will not be treated as though they were similar." *Bell v. State,* 693 P.2d 769, 771 (Wyo.1985) (citing Nowak, Rotunda and Young, *Constitutional Law* (2nd ed.1983), p. 587). We have declared: "Equal protection in Wyoming requires a law to operate alike upon all persons or property under the same circumstances and conditions." *WW Enterprises, Inc. v. City of Cheyenne,* 956 P.2d 353, 356 (Wyo.1998) (citing *Ludwig v. Harston,* 65 Wyo. 134, 197 P.2d 252, 257 (1948)).

[¶ 50] We have stated on numerous occasions "the Wyoming Constitution offers more robust protection against legal discrimination than the federal constitution." *Allhusen,* 898 P.2d at 884 (citing *Wilson v. State ex rel. Office of Hearing Examiner,* 841 P.2d 90 (Wyo.1992); *Johnson v. State Hearing Examiner's Office,* 838 P.2d 158 (Wyo.1992); *Washakie County Sch. Dist. No. 1 v. Herschler,* 606 P.2d 310 (Wyo.1980), *cert. denied* 449 U.S. 824, 101 S.Ct. 86, 66 L.Ed.2d 28 (1980); *Nehring v. Russell,* 582 P.2d 67 (Wyo.1978)). Yet, the majority declines to discuss Johnson's argument in this regard, dismissing the idea of greater protection afforded by the Wyoming Constitution. The statutory scheme at issue in this case permits unequal treatment for people whose conduct is identical. In the face of our long tradition claiming the Wyoming Constitution provides more protection than the federal constitution and the real possibility of the law operating differently on similarly situated people, I think Johnson's argument to have merit.

[¶ 51] Nevertheless, I need not make the determination that the Wyoming Constitution provides greater protection than the federal constitution in this area either. For even if it does, the *Batchelder* case relied

upon by the majority is distinguishable from the case at hand. I therefore cannot agree with the majority's statement "the issues Johnson raises in this regard have been decided against him by the United States Supreme Court on the basis of his federal constitutional claims." ¶ 33. As noted by the discussion of LaFave, Israel, and King quoted by the majority, three groups of duplicative statutes exist. ¶ 30. This case is akin to the third group, where the statutes are identical. As such "there is nothing at all rational about this kind of statutory scheme, as it provides for different penalties without any effort whatsoever to explain a basis for the difference." 4 Wayne R. LaFave, Jerold H. Israel, and Nancy J. King, *Criminal Procedure* § 13.7(a), 96 (1999 and Supp.2002).

[¶ 52] The elements of first degree felony murder based on the underlying felony of child abuse and the elements of felony child abuse involving the death of a child are identical. The duplication of these two crimes occurs in part because the felony murder statute necessitates the use of the child abuse statute to define "abuse of a child." Therefore, both crimes require the intentional or reckless killing of a child under the age of sixteen by an adult or person six years older than the child.[1] The only difference between the two crimes is the punishment.

[¶ 53] To further illustrate this point, I consider what proof would be required under each statute for Johnson's conduct. If the prosecutor wanted to charge child abuse in this instance, he would have to prove beyond a reasonable doubt that Daniel Johnson is an adult and that he intentionally or recklessly inflicted upon a child under the age of sixteen (16) years physical injury, in this case death. If the prosecutor wanted to charge felony murder in this instance, he would have to prove beyond a reasonable doubt that Daniel Johnson killed a child while perpetrating child abuse on a child under the age of

sixteen. The elements of child abuse here would require proof that Johnson intentionally or recklessly inflicted upon a child under 16 years of age physical injury, in this case death. The statutes are identical in the sense that they punish the exact same conduct with no differing elements of proof. Obviously, the statutes include other instances of conduct that are prohibited; but, as applied to child abuse that results in death, they are identical. At least one commentator has opined that the United States Supreme Court would declare a statutory scheme unconstitutional if confronted with identical statutes but differing punishments. *See,* Martin H. Tish, Comment, *Duplicative Statutes, Prosecutorial Discretion, and the Illinois Armed Violence Statute,* 71 J.Crim. L. & Criminology 226, 236 (1980). Other Jurisdictions have drawn such distinctions. *See, People v. Marcy,* 628 P.2d 69 (Colo.1981); *State v. Modica,* 58 Haw. 249, 567 P.2d 420 (1977); *Incorporated County of Los Alamos v. Montoya,* 108 N.M. 361, 772 P.2d 891 (App.1989) (reaffirming *State v. Chavez,* 77 N.M. 79, 419 P.2d 456 (1966)); *State v. Fedorowicz,* 2002 UT 67, ¶¶ 46–48, 52 P.3d 1194, ¶¶ 46–48 (Utah 2002) (explaining *State v. Shondel,* 22 Utah 2d 343, 453 P.2d 146 (1969) and its progeny).

[¶ 54] Moreover, with overlapping statutes as opposed to identical statutes, the statutes themselves frequently focus on different types of conduct, thereby giving the prosecutor some idea as to which statute he should proceed under. *See,* LaFave, at 97. The statutory scheme before us presents no such guidance. Under both statutes, causing the death of a child from child abuse is the conduct the State is seeking to punish. No extra proof is required for one crime over the other, nor is there any indication of factors to consider in making the charging decision. With this complete lack of guidance, it ap-

---

1. The statute in effect when Johnson was charged made no distinction between "a person responsible for a child's welfare" and "a person who is not responsible for a child's welfare." The statute has been subsequently amended and now contains such a distinction. *Compare* Wyo. Stat. Ann. § 6–2–503 (Michie 1988 and Supp. 1995) *with* Wyo. Stat. Ann. § 6–2–503 (LexisNexis 2001 and Supp.2002). Thus, while Johnson was the victim's father and would presumably meet the definition of "a person responsible for a child's welfare" under Wyo. Stat. Ann. 14–3–202(a)(i) (LexisNexis 2001 and Supp.2002), the statute in effect at that time required only that the child be under the age of sixteen (16) regardless of the "actor." The later amendment utilizes a standard of eighteen (18) for "a person responsible for a child's welfare."

pears that the prosecutor's charging decision is completely arbitrary. For example, two persons, conducting themselves identically, each shake a baby resulting in the death of the child. The statutes authorize one person to be exposed to a possible sentence of death and the other to be exposed to a sentence of no more than five years. Such obvious unequal treatment of persons identically situated clearly violates the guarantee of equal protection.

[¶ 55] Under this scheme, the prosecutor could randomly discriminate against persons simply because of the group they belong to, or because he dislikes them, or because he is simply having a bad day. The statutory scheme "furnishes a convenient tool for 'harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure.' " *Kolender v. Lawson,* 461 U.S. 352, 360, 103 S.Ct. 1855, 1860, 75 L.Ed.2d 903, 911 (1983) (citing *Papachristou v. City of Jacksonville,* 405 U.S. 156, 170, 92 S.Ct. 839, 847–48, 31 L.Ed.2d 110 (1972)). If the prosecutor pursues a harsher penalty against those persons he does not like, his action brings about selective enforcement based on an arbitrary classification (i.e. the prosecutor's dislike). Such arbitrary action has long been prohibited by the federal constitution. *See,* Tish at 232; *Oyler v. Boles,* 368 U.S. 448, 82 S.Ct. 501, 7 L.Ed.2d 446 (1962); *Yick Wo v. Hopkins,* 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886).

[¶ 56] *Batchelder* is distinguishable on yet another ground. In *Batchelder,* the disparity between the punishments under the two overlapping statutes was small. LaFave, Israel, and King explain this issue as follows:

In response to the Court of Appeals' objection that the prosecutor was given unfettered discretion in "selection of which two penalties to apply," the Supreme Court answered that the government had not been allowed "to predetermine ultimate criminal sanctions" but instead had simply enabled "the sentencing judge to impose a longer prison sentence." That is, the prosecutor's choice of the statute which allowed imprisonment "not more than five years" rather than the one providing for imprisonment "not more than two years" had simply added to the judge's sentencing discretion. But what if, for example, one statute permitted imprisonment up to ten years and the other made ten years the mandatory minimum? It has been forcefully argued that in such a case, where the prosecutor actually "makes a sentencing decision, without either sentencing information or expertise in sentencing," this "sentencing aspect of the prosecutor's choice distinguishes the prior cases and is the strongest support for the equal protection argument."

LaFave, at 97–98 (footnote omitted). This case presents precisely the problem the professors envision. Under the statutory scheme in *Batchelder,* the possibility existed that the same or very similar punishments would be levied regardless of the charging statute. Here, the enormous difference between punishments leaves no possibility of the same or even similar punishment. Disparity such as this smacks of an equal protection violation.

[¶ 57] I would lastly mention one other area in which *Batchelder* is distinguishable. In *Batchelder,* the Supreme Court heavily relied on legislative intent divined from legislative history. *United States v. Batchelder,* 442 U.S. 114, 119–21, 99 S.Ct. 2198, 2201–02, 60 L.Ed.2d 755 (1979). There, it was clear that "Congress intended to enact two independent gun control statutes, each fully enforceable on its own terms." 442 U.S. at 119, 99 S.Ct at 2202. We do not have any such legislative history in this case to indicate the legislature's intent. Instead, what we do have is the legislature later amending the statutes to remove the offending portion.[2] Such action indicates to me that the legislature recognized its error and the problems it

2. The 2002 amendment to the definition of "physical injury" as found in Wyo. Stat. Ann. § 14–3–202(a)(ii)(B), removed the word "death" and added additional language regarding skin bruising. *See,* Wyo. Stat. Ann. § 14–3–202 (Lex-isNexis 2001 and Supp.2002); ¶¶ 23–24. By removing the word "death" from the definition of "physical injury" the legislature eliminated the very problem at issue in this case. The duplicative statutes seen in this case no longer exist.

would cause and corrected the error.[3]

[¶ 58]  Thus, differences between *Batchelder* and the case at hand render that decision distinguishable on several levels.  Considering the significant differences indicated above, I find the majority's reliance on *Batchelder* misplaced.

---

**3.**  Because providing two vastly different penalties for the exact same conduct makes no sense, I can only conclude that the duplication at issue in this case is error.  Surely, if the legislature had given any thought to the overlap, it would have drafted the statutes to avoid duplication.  LaFave, Israel, and King suggest that duplicative statutes such as these are the consequence of legislative carelessness.  LaFave at 96.  I agree, "and even if it is not such a scheme serves no legitimate purpose.  There is nothing at all rational about this kind of statutory scheme, as it provides for different penalties without any effort whatsoever to explain the basis for the difference."  *Id.*