2006 WY 77

Jesse Dan BOLIN, Appellant (Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

No. 05–129.

Supreme Court of Wyoming.

June 29, 2006.

Representing Appellant: Diane E. Courselle, Director DAP; Joseph J. Petrone, Student Director. Argument by Mr. Petrone.

Representing Appellee: Patrick J. Crank, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Matthew D. Obrecht, Student Intern. Argument by Mr. Obrecht.

Before HILL, C.J., and GOLDEN, KITE, VOIGT, and BURKE, JJ.

KITE, Justice.

[¶ 1]   Jesse Dan Bolin was convicted by a jury of two counts of delivery of marijuana in violation of Wyo. Stat. Ann. § 35–7–1031(a)(ii) (LexisNexis 2005).   He appeals claiming plain error occurred when the district court allowed expert testimony from a police detective concerning what is usually done in drug investigations rather than what was actually done in this investigation and the confidential informant's credibility.   He also asserts the district court erred in allowing him to appear *pro se* during sentencing without first ensuring he voluntarily waived his right to counsel.   We conclude no error occurred and affirm the conviction.

## ISSUES

[¶ 2]   Mr. Bolin presents the following issues for our review:

I.   Plain error occurred when the district court permitted irrelevant expert testimony concerning evidence of what is *usually* done in drug investigations rather that what *actually* was done in this case; permitted testimony explaining procedures in methamphetamine and crack cocaine investigations not related to the present marijuana case; and permitted detective Harper to vouch for the confidential informant's credibility.

II. The district court erred by allowing the defendant to proceed *pro se* during sentencing without first ensuring that his waiver of counsel was made voluntarily.

The State re-phrases the issues as follows:

I. Whether plain error occurred when detectives testified to standard department procedure related to the use of a confidential informant to make a controlled buy from a suspected narcotics dealer, and mentioned other illegal narcotics in addition to marijuana.

II. Whether plain error occurred when detective Harper testified concerning the procedure used to ensure that the confidential informant in this case provided the Cheyenne Police Department with reliable information during the controlled buys.

III. Whether the district court erred by allowing appellant to proceed *pro se* at his sentencing hearing.

## FACTS

[¶ 3] On March 8, 2004, the Laramie County District Attorney's Office issued an information alleging Mr. Bolin delivered marijuana in violation of § 35–7–1031(a)(ii) on February 2, 9 and 20, 2004, and possessed marijuana with intent to deliver in violation of Wyo. Stat. Ann. § 35–7–1014(d)(xiii) (LexisNexis 2005) on February 23, 2004. The affidavit of probable cause issued with the information alleged a confidential informant told the Cheyenne Police Department where Mr. Bolin resided, what kind of vehicle he drove and that he was selling marijuana. The affidavit further alleged detectives decided to attempt a controlled buy from him after confirming Mr. Bolin lived at the address identified.

[¶ 4] The affidavit further alleged the details of the controlled buy. Detectives had the confidential informant place a recorded phone call to Mr. Bolin to make arrangements to purchase marijuana. They provided the informant with money for the purchase, fitted him with a wireless transmitter, and kept him under surveillance as he proceeded to the meeting spot with Mr. Bolin. During the encounter, detectives heard the informant count out $25.00 to Mr. Bolin. After the encounter, the informant turned over approximately ten grams of marijuana to detectives.

[¶ 5] The affidavit further alleged detectives and the confidential informant followed substantially the same process on February 9 and 20, 2004. The only material differences on those dates were the purchases occurred at Mr. Bolin's residence and the informant purchased one-half ounce of marijuana. On February 23, 2004, detectives arrested Mr. Bolin at his residence and charged him with three counts of delivery and one count of possession of marijuana.

[¶ 6] Pursuant to a motion filed by the district attorney's office, the district court dismissed the possession count prior to trial.[1] The remaining three counts of delivery of marijuana were tried to a jury on November 8 and 9, 2004. The State presented the testimony of three detectives and the confidential informant who described the events surrounding each of the drug transactions. At the close of the State's case, the defense moved for an acquittal, arguing the State had not proven its case because the only witness actually involved in the purchases, the confidential informant, was unreliable. The district court denied the motion on the grounds that determining witness credibility was a jury function. After the denial of its motion, the defense rested, presenting no witnesses of its own. The jury returned a verdict finding Mr. Bolin guilty on the first two counts of delivery of marijuana and not guilty on the third count.[2] Mr. Bolin was sen-

---

1. At the time of the arrest, the arresting officer found marijuana in Mr. Bolin's home. The defense moved to suppress evidence of the marijuana on the grounds Mr. Bolin was not informed of his *Miranda* rights prior to the questioning and search that led to discovery of the marijuana. The State responded by filing a motion to dismiss the possession charge and vacate the suppression

motion hearing. The district court granted both motions, dismissing Count IV of the information and vacating the hearing on the motion to suppress.

2. There is no indication in the record as to the jury's reasoning for finding Mr. Bolin not guilty on Count III.

tenced to consecutive terms of two to four years in the Wyoming State Penitentiary.

## STANDARD OF REVIEW

■■■■ [¶ 7] The defense did not object at trial to the expert testimony about which Mr. Bolin now complains in his first two issues. When no objection is made, the plain error standard applies. Plain error occurs when: 1) the incidents alleged as error clearly appear in the record; 2) the party claiming plain error demonstrates that a clear and unequivocal rule of law was violated; and 3) the party demonstrates he has been denied a substantial right resulting in material prejudice. *Farmer v. State*, 2005 WY 162, ¶ 26, 124 P.3d 699, 709 (Wyo.2005). Because of the constitutional implications present when a defendant is forced to appear *pro se* after refusing, either explicitly or implicitly, to accept the services of appointed counsel, we conduct a *de novo* review of Mr. Bolin's third claim. *Trujillo v. State*, 2 P.3d 567, 571 (Wyo.2000).[3]

## DISCUSSION

### 1. Plain Error

#### a. Expert Testimony Concerning Drug Investigations

[¶ 8] Mr. Bolin contends plain error occurred when detectives testified about the procedures *generally* followed by the Cheyenne Police Department when conducting drug investigations using a confidential informant but not about the procedures they followed in *this* drug investigation with *this* confidential informant. He also claims plain error occurred when the detectives testified concerning drug investigations involving methamphetamine and crack cocaine in addition to marijuana. The State argues no plain error occurred.

[¶ 9] In support of his claim of plain error in the testimony concerning general rather than specific investigative procedures, Mr.

Bolin cites the following excerpt from Detective James Harper's trial testimony:

Q. You mentioned something about searching a car. What's that all about?

A. Well, if the informant is going to drive to a meet, we want to search the car. Basically, the only thing—we want to show that the only thing that the informant—only place he could have gotten drugs was from the dealer. So he can't have any drugs in his car. So we go on and search it.

Q. How was that done?

A. Well, everybody does it just a little bit differently. I usually start in the front seat, look over the visors, look on the dash, look in the ashtray, pull out the ashtray, look behind the ashtray. I—same thing with the glove box, look underneath the dash, any parts in the console, look in the console, see if any of those parts come out, and if they do, look in there and shine a flashlight around there, look under the front seat, look in the front seat.

If it's got, like, seat covers, pull those up and look underneath the seat covers. I already said underneath the dash.

He also quotes the following testimony from Detective Jason Moon:

Q. What's involved in a search like that?

A. We, basically, go through the interior of the vehicle, make sure there's no contraband, no narcotics, no weapons, anything of that sort in the vehicle before we sent them out.

■■■■ [¶ 10] One difficulty with Mr. Bolin's argument is that it does not take into account other testimony and exhibits presented at trial. The State introduced the agreement signed by the confidential informant setting forth the terms under which this informant was to act on behalf of law enforcement in this case specifically. Additionally, Detective Harper testified he searched the informant in this case prior to the attempted purchase from Mr. Bolin. He stated:

**3.** The abuse of discretion standard applies when a trial court refuses to appoint substitute counsel. *Allen v. State*, 2002 WY 48, ¶ 26, 43 P.3d 551, 560 (Wyo.2002). That standard is not applicable

here because the trial court did appoint substitute counsel, the services of whom Mr. Bolin refused to accept.

I had [him] take off his shirt, search that separately, kick off his shoes, and after the shoes are off, will feel around the socks, make sure there's [no] bulges or anything crinkly, anything like that, pat down the legs, feels down the legs all the way. I don't make him take off his pants, but basically, run my hands over just every part.

Detective Harper also testified the searches he conducts do not vary depending on the type or quantity of drugs the confidential informant is attempting to buy. He stated: "We search everybody the same. We search every vehicle the same." He testified he searched the confidential informant involved in Mr. Bolin's case in accordance with the usual procedure before and after each of the buys. Detective Moon testified he searched the informant's vehicle. The confidential informant also testified the detectives searched him and his vehicle before the buys. The testimony indicated the detectives searched the informant and his vehicle using the same procedure usually used in cases involving attempted drug purchases by a confidential informant. The testimony concerning the searches violated no clear rule of law and Mr. Bolin has not shown it denied him a substantial right resulting in material prejudice. Therefore, its admission was not plain error.

[¶ 11] Mr. Bolin cites *Contreras v. State*, 7 P.3d 917 (Wyo.2000) as support for his contention that general testimony concerning police procedures is not admissible without testimony addressing the specific procedures followed in the particular case. In *Contreras*, the defendant argued the trial court erred when it allowed a deputy to explain procedures used to ensure the reliability of drug buys, and to testify those procedures were followed in that case. He claimed this testimony was improperly used to bolster the testimony of an informant. Applying the plain error standard, we concluded Mr. Contreras could not show a clear and unequivocal rule of law was violated by admission of the testimony; therefore, there was no plain error.

[¶ 12] Mr. Bolin argues there was no plain error in *Contreras* because the deputy testified the general procedures he described

were followed in investigating Mr. Contreras. Mr. Bolin argues there was plain error in his case because the deputies testified only concerning general procedures without saying those procedures were followed in using the confidential informant in his case. As reflected in the trial excerpts quoted above, the detectives in this case testified the same procedures were followed in using the confidential informant to investigate Mr. Bolin as were utilized in other confidential informant cases. Additionally, the detectives testified concerning the actual investigation conducted in this case—the confidential informant placed telephone calls to Mr. Bolin, arranging times and places to meet; he was provided with money to purchase marijuana from Mr. Bolin; he and his vehicle were searched before and after he met with Mr. Bolin; and after each meeting he turned marijuana over to the detectives. Contrary to Mr. Bolin's assertion, application of *Contreras* supports the conclusion that the testimony was not plain error.

[¶ 13] Mr. Bolin also asserts plain error in the admission of testimony concerning investigations involving methamphetamine and crack cocaine. The testimony about which he complains was presented by Detective Harper on questioning by the State:

Q. . . we're just speaking in generalities here, but once you've been able to run some of this background information and satisfy yourself that you've got someone who really exists as a target, what do you do then with your confidential informant?

A. Well, then we try to set up a time to make a controlled buy.

Q. And how's that done?

A. Usually, we try to make them—or have the informant make a phone call; otherwise, we're wasting a lot of time if the dealer's not home. So usually, we try to make a phone call, set up either a place to meet or a time for the informant to come over.

Q. Is this fairly straightforward in terms of, "Hi, this is Charlie Confidential. I want to come over and see you, Joe Druggie, and purchase 20 pounds of methamphetamine," or is that the sort of phone call you're used to being part of?

A. Absolutely not.

Q. What do you generally see?

A. Either the phone calls are coded or they just talk about meeting.

Q. What do you mean, "coded"?

A. One of the things—I'll give an example.

An eight ball is a measurement of either methamphetamine or cocaine, and it's referred to on the street as an eight ball.

Q. Why a name like eight ball, it is big and round and black or—

A. No. It's, actually, an eighth of an ounce, and usually, it comes—it's powder. If it's in a bag, it's a ball, so that's where it got the name of an eight ball, but there's been several times I'll have an informant call up and say, "Hey, I want to come over and play a game of pool."

Well, the dealer does not have a pool table, or anything like that, but they associate a game of pool with eight ball.

Mr. Bolin contends this testimony concerning "unrelated drug dealers, in unrelated drug transactions, involving different controlled substances" violated a clear rule of law prohibiting the admission of irrelevant evidence, violated his substantial right to be tried on the untainted evidence against him and materially prejudiced him because it concerned methamphetamine, a controlled substance of widespread concern to the community.

[¶ 14] In the context in which the testimony was given, i.e. the general procedures used by law enforcement in conducting drug investigations with confidential informants, the testimony about which Mr. Bolin complains was relevant. When evidence forms part of the history of the event or serves to enhance the natural development of the facts, it is admissible as long as its probative value outweighs its prejudicial effect. *Williams v. State,* 2004 WY 117, ¶ 11, 99 P.3d 432, 439 (Wyo.2004). Such evidence is proper unless we conclude it should have been excluded because the danger of unfair prejudice from its admission substantially outweighed its probative value. W.R.E. 403. Considered in the context of plain error, we do not believe the danger of prejudice from Detective Harper's testimony outweighed its

probative value. It was clear from the testimony, jury instructions, and statements and arguments of counsel that this case involved delivery of marijuana and nothing more. The discussion of other drugs during the detective's testimony clearly concerned drug investigations in general and served only as preliminary information. It did not relate to the charges against Mr. Bolin and there is no indication from the record the jury thought otherwise. We hold admission of the testimony did not violate a clear rule of law or deny a substantial right resulting in material prejudice.

### b. Expert Testimony Concerning Reliability of Confidential Informant

[¶ 15] Mr. Bolin asserts plain error also occurred when Detective Harper testified concerning the confidential informant's reliability. He cites the following excerpts from the detective's testimony:

Q. What sort of process do you follow up on being presented with somebody that may or may not be a potential informant?

A. Well, first, we sit down and do an interview and we tell them right off the bat, "You have to be 100 percent honest. If we think you're being dishonest with us at all, we're not going to use you. You're not going to get this opportunity to work for us". . . .

Q. Did you check his background?

A. I asked him about his background. He was very forthcoming, said he had a felony on his record, that it was for either accessory or conspiracy to robbery. Actually, that was one of the things that gave me some good feelings, like maybe I could trust him, because it wasn't—he didn't try to downplay it. Didn't lower it at all. He just said, "Yeah, this is what I did. This is what I got charged with."

Mr. Bolin contends this testimony violated the clear rule of law prohibiting a witness from testifying as to another witness' credibility, denied him a substantial right to due process and a fair trial and materially prejudiced him.

[¶ 16]

Generally, one witness may not testify as to another witness' credibility. The purpose of this rule is to preserve the integrity of the jury process by protecting the jury's right to act as the final determiner of the credibility of the witnesses. We have stated, however, that a trial court does not necessarily commit plain error when it allows testimony which illuminates some aspect of the case even though the testimony incidentally bolsters the credibility of another witness.

*Strickland v. State*, 2004 WY 91, ¶ 22, 94 P.3d 1034, 1045–46 (Wyo.2004) (citation omitted). Applying these principles in *Burton v. State*, 2002 WY 71, ¶ 41, 46 P.3d 309, 320 (Wyo.2002), we held it was not plain error to allow testimony from a detective to the effect that the victim's testimony at trial was in harmony with her earlier statements. We said:

> [The detective] did not state that he believed the victim's version of the events or that he believed Burton was guilty of the offenses. Even though the detective's testimony may have had the incidental effect of bolstering the victim's credibility, the trial court did not violate a clear and unequivocal rule of law when it allowed the testimony into evidence at trial.

*Id.* (citation omitted).

[¶ 17] In *Ogden v. State*, 2001 WY 109, 34 P.3d 271 (Wyo.2001), we likewise held there was no plain error in eliciting testimony from a detective to the effect that three teenage witnesses provided good detail and were obviously focused on the event and the victim's statement was consistent with their statements. After analyzing the detective's testimony, we concluded he did not state he "believed the young witnesses were credible. He merely testified that the versions of what happened were consistent with one another and that he relied upon the statements in determining that sufficient probable cause existed to arrest Ogden." *Ogden*, ¶ 29, 34 P.3d at 278.

[¶ 18] In accord with our precedent, we hold that Detective Harper did not improperly comment on the credibility of the confidential informant. He merely testified the informant was forthcoming in disclosing his prior conviction and he relied upon that disclosure in deciding to use him as an informant. Detective Harper did not state he believed the informant was credible or encroach on the jury's right to determine his credibility. Any incidental effect the testimony may have had to bolster the informant's credibility was not plain error.

### 2. Voluntariness of Waiver of Right to Counsel

[¶ 19] In his final issue, Mr. Bolin asserts the district court erred when it allowed him to appear *pro se* at sentencing without first determining he voluntarily waived his right to counsel. The facts underlying this claim are that after the jury returned its verdict, defense counsel moved to withdraw from representation of Mr. Bolin, stating a conflict had arisen. Defense counsel also moved for the appointment of substitute counsel to represent Mr. Bolin. The district court granted both motions and entered an order appointing substitute counsel. Substitute counsel, like Mr. Bolin's trial counsel, worked with the public defender's office.

[¶ 20] Mr. Bolin filed a motion to dismiss the public defender's office, claiming a conflict of interest existed on the part of the entire office because he had filed a complaint against trial counsel alleging he violated several rules of professional conduct. With his motion to disqualify the public defender's office, Mr. Bolin also filed a motion for appointment of substitute counsel not associated with the public defender's office.

[¶ 21] The district court held a hearing at which time it denied Mr. Bolin's motion, stating Mr. Bolin had the right to be represented by a public defender, but did not have the right to court appointed counsel of his own choice. The district court gave Mr. Bolin the choice of appearing at sentencing without counsel or represented by a substitute attorney from the public defender's office. Mr. Bolin declined representation by anyone associated with the public defender's office and elected to proceed without counsel.

[¶ 22] At that point, the following colloquy occurred:

THE COURT: What is your age?

THE DEFENDANT: 22.

THE COURT: What is your level of education?

THE DEFENDANT: GED.

* * *

THE COURT: You received a general equivalency degree or diploma? When was that?

THE DEFENDANT: In '99.

THE COURT: And how and where did you receive that?

THE DEFENDANT: Newcastle, Wyoming, through the state boot camp program.

THE COURT: How far did you go in school?

THE DEFENDANT: Ninth grade.

THE COURT: How well did you do in school? Did you pass grades while you were in school?

THE DEFENDANT: Not really.

THE COURT: In your view, what will be required for you to do at the sentencing hearing? What would be your objectives?

THE DEFENDANT: My objective would be to cast doubt on—I don't know what kind of time DA's asking for. Until I know all that, I couldn't really say.

THE COURT: Well, you understand that the Court will be required to impose a sentence within the maximum provided by the legislature.

THE DEFENDANT: Zero to 10?

THE COURT: Right. You understand the Court will be required to impose a sentence within the maximum provided by the legislature?

THE DEFENDANT: Yes, sir.

THE COURT: And you will be arguing for the lowest possible sentence; is that correct?

THE DEFENDANT: Yes, sir.

THE COURT: Generally, how do you intend to approach that?

THE DEFENDANT: The fact that the amounts were quite small in this case—the amounts of marijuana that were transactioned; the fact that it is just marijuana, not something else.

THE COURT: Those certainly are all valid considerations. Do you intend to ask people to speak in your behalf?

THE DEFENDANT: I'll be trying to get ahold of people now that I know the day.

The district court concluded Mr. Bolin was articulate, understood and responded appropriately to questions, understood the issues involved in his sentencing and could adequately represent himself at sentencing. Accordingly, Mr. Bolin appeared without counsel at his sentencing hearing.

[¶ 23] Before addressing the voluntariness of Mr. Bolin's waiver of counsel, there is another matter we find it necessary to consider. Mr. Bolin did not cite Rule 1.10(a) of the Rules of Professional Conduct in support of his claim that appointment of substitute counsel from the public defender's office was not appropriate after trial counsel, also a public defender, withdrew because of a conflict of interest. However, his claim cannot be fairly addressed without discussing the rule. Rule 1.10(a), and this Court's interpretation of it in the context of legal services organizations like the public defender's office, is the basis upon which the propriety of the appointment of substitute counsel must be judged. Rule 1.10(a) provides:

> While lawyers are associated in a firm, none of them shall knowingly represent a client when any one (1) of them practicing alone would be prohibited from doing so by Rule 1.7, 1.8(c), 1.9 or 2.2.

Rules 1.7, 1.8(c), 1.9 and 2.2 are the rules of professional conduct relating to conflicts of interest.[4]

---

4. Rule 1.7(b) is the only provision referenced in Rule 1.10(a) relevant in the context of Mr. Bolin's case. It provides:

> RULE 1.7  CONFLICT OF INTEREST: GENERAL RULE
>    * * *
>    (b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
>    (1) the lawyer reasonably believes the representation will not be adversely affected; and
>    (2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation

[¶ 24] The clear language of Rule 1.10(a) prohibits all attorneys in a firm from knowingly representing a client when any of the attorneys practicing alone would be prohibited from doing so because of a conflict of interest. The comment following the rule defines "firm" to include not only private law firms but attorneys employed in legal services organizations. We have said, however, the public defender's office warrants slightly different treatment than other "firms."

[¶ 25] In the context of an alleged conflict of interest based upon representation of co-defendants by separate attorneys from the public defender's office, we said a case-by-case inquiry, rather than per se disqualification, was appropriate. *Asch v. State*, 2003 WY 18, ¶¶ 21–24, 62 P.3d 945, 953 (Wyo. 2003). We provided several reasons for rejecting automatic disqualification of assistant public defenders under these circumstances:

> The first reason is aptly stated in Comment d(iv) to Section 203(2) of The Restatement (Third) of Law Governing Lawyers:
>
> Public defenders who are subject to a common supervisory structure within an organization ordinarily should be treated as independent for purposes of [imputing conflicts of interest]. The lawyers provide legal services, not to the public defender office, but to individual defendants. Ordinarily, the office would have no reason to give one defendant more vigorous representation than other defendants whose interests are in conflict. Thus, while individual defendants should be represented by separate members of the defender's office, the representation of each defendant should not be imputed to other lawyers in an office where effective measures prevent communications of confidential client information between lawyers employed on behalf of individual defendants.

Similarly, there is no financial incentive for attorneys in a public defender's office to favor one client over another. The public defender does not receive more money if one client prevails and another does not.

An assistant public defender, as a salaried government employee, simply does not have the financial interest in a case that is inherent in private practice.

Another reason to adopt a case-by-case inquiry for conflicts of interest within the State Public Defender's Office is that to do otherwise would needlessly jeopardize the right of individual defendants to skilled and competent representation. As noted by the Illinois Supreme Court, "[i]n many instances the application of such a per se rule would require the appointment of counsel with virtually no experience in the trial of criminal matters, thus raising, with justification, the question of competency of counsel."

*Id.* (citations omitted).

[¶ 26] We have also rejected a bright-line rule requiring disqualification of an entire "firm" in the context of an alleged conflict of interest based upon prosecution of a defendant by a district attorney's office that hired an attorney who formerly represented the defendant. *Johnson v. State*, 2003 WY 9, ¶ 19, 61 P.3d 1234, 1243 (Wyo.2003). We said: we decline to adopt an "appearance of impropriety" standard and adopt instead a "function approach," which focuses on preserving confidentiality and avoiding positions adverse to the client. *Id.* In the context of *Johnson*, we adopted a detailed screening procedure for avoiding conflicts and the appearance of impropriety.

[¶ 27] Thus, Wyoming has not adhered to a per se disqualification rule for assistant district attorneys or public defenders when a conflict of interest is alleged. Rather, we have recognized important distinctions between those legal service providers and private law firms warranting a case-by-case approach to conflicts alleged against public defenders and district attorneys. Applying this approach in *Johnson*, we held the defendant was not substantially prejudiced by the district attorney's handling of the case. In *Asch* we concluded there was nothing in the record from which we could conclude a conflict of interest existed. Although *Asch*

---

shall include explanation of the implications of the common representation and the advan-

tages and risks involved.

and *Johnson* involved different fact situations, they are instructive in terms of the general principles espoused.

[¶ 28] Applying those principles, it is clear Mr. Bolin was not entitled to automatic disqualification of substitute counsel from the public defender's office. Rather, he was entitled to have the district court consider the alleged conflict of interest based upon the particular facts of his case. Based upon those facts, we conclude the district court did not err in appointing substitute counsel from the public defender's office after allowing the assistant public defender who represented Mr. Bolin at trial to withdraw. The reasons Mr. Bolin gave for his dissatisfaction with trial counsel did not warrant rejection of representation by another public defender. There is nothing in the record from which we can conclude a conflict of interest existed or that Mr. Bolin would have been substantially prejudiced by the appointment of another public defender. There is likewise nothing in the record from which we can conclude the public defender's office would have failed to preserve confidentiality and avoid positions adverse to the Mr. Bolin during the sentencing phase of his case. Absent some argument and evidence to the contrary, we presume the public defender's office has in place a detailed screening procedure for avoiding conflicts and the appearance of impropriety.

[¶ 29] Turning to the voluntariness of the waiver of counsel, Mr. Bolin claims his waiver was not voluntary because he was forced to choose between appearing either with incompetent, unprepared counsel or without legal representation, which was not really a choice at all. The Sixth Amendment provides the accused shall have the right to the assistance of counsel in all criminal prosecutions. *Trujillo*, 2 P.3d at 573. The Fourteenth Amendment incorporates the Sixth Amendment right to counsel, requiring the state to make appointed counsel available to indigent defendants in all criminal prosecutions. *Id.* Counsel is required at those critical stages in which the substantial rights of the accused may be affected. *Id.* We have held sentencing is a critical stage where substantial rights may be affected

and, therefore, the right to counsel attaches. *Id.*

[¶ 30] The Sixth Amendment also guarantees the right of every citizen to conduct his own defense. *Id.*

A defendant has a constitutional right to waive his right to counsel and to represent himself at criminal trial. However, to be valid, the trial judge must ensure that the waiver of counsel is an intentional relinquishment or abandonment of a known right or privilege. Ideally, the trial judge should conduct a thorough and comprehensive formal inquiry of the defendant on the record to demonstrate that the defendant is aware of the nature of the charges, the range of allowable punishments and possible defenses, and is fully informed of the risks of proceeding pro se.

*Id.*

[¶ 31] A defendant, by refusing to accept the services of appointed counsel, can waive his right to counsel. In determining whether a defendant has made a valid waiver of the right to counsel, we determine first whether the defendant's waiver was voluntary. *Wilkie v. State*, 2002 WY 164, ¶ 7, 56 P.3d 1023, 1024 (Wyo.2002). If we conclude the wavier was voluntary, we then determine whether the defendant waived the right knowingly and intelligently. *Id.* In making that determination, we indulge every reasonable presumption against waiver. *Id.* However, when a defendant is given a clear choice between waiver of counsel and retention of present counsel, the choice is voluntary so long as defendant's refusal to proceed with able appointed counsel is without good cause. *Trujillo*, 2 P.3d at 574. We have also said:

The Sixth Amendment does not guarantee a meaningful relationship with appointed counsel; the purpose of providing assistance of counsel is to ensure that criminal defendants receive a fair trial. A defendant has no right to the appointed counsel of his choice nor to counsel who would blindly follow his instructions. In evaluating Sixth Amendment claims, the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such. A court's own evalua-

tion of counsel and the effect of any substitution upon the scheduled proceedings are proper considerations in addition to the reasons given for a defendant's dissatisfaction.

*Allen v. State*, 2002 WY 48, ¶ 27, 43 P.3d 551, 560 (Wyo.2002). A trial court has substantial latitude in deciding if counsel must be disqualified. *Johnson*, ¶ 19, 61 P.3d at 1243.

██ [¶ 32] Applying these principles, we hold Mr. Bolin voluntarily waived his right to counsel at the sentencing hearing. When Mr. Bolin requested the appointment of substitute counsel, the district court appointed another attorney from the public defender's office. Mr. Bolin then requested the appointment of an attorney outside the public defender's office, claiming the complaint he filed against trial counsel created a conflict of interest for the entire public defender's office. The district court responded by stating there was no basis for appointing substitute counsel outside the public defender's office, the public defender's office did a competent, professional job representing Mr. Bolin at trial, and no showing had been made as to why substitute counsel from the public defender's office could not represent him during sentencing.

[¶ 33] The district court's appointment of substitute counsel gave Mr. Bolin a clear choice between appearing with legal representation or appearing *pro se*. Mr. Bolin was not entitled to appointed counsel of his own choosing. He chose to proceed without counsel without showing good cause for refusing to accept representation by appointed substitute counsel. At the time he made that decision, Mr. Bolin was aware of the risks involved in proceeding without legal representation—the jury had returned a guilty verdict on two counts of delivery of marijuana and, as reflected in the record, Mr. Bolin knew the maximum penalty he faced. Given all of the circumstances, we hold the district court did not err in allowing Mr. Bolin to proceed without legal representation at his sentencing hearing.

[¶ 34] Affirmed.