2011 WY 169

**Brodey A. BURNETT, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. S–11–0081.

Supreme Court of Wyoming.

Dec. 28, 2011.

Representing Appellant: Diane M. Lozano, State Public Defender; Tina N. Olson, Appellate Counsel; Eric M. Alden, Senior Assistant Appellate Counsel. Argument by Mr. Alden.

Representing Appellee: Gregory A. Phillips, Attorney General; Terry L. Armitage, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General. Argument by Mr. Pauling.

Before KITE, C.J., and GOLDEN, HILL, VOIGT, and BURKE, JJ.

BURKE, Justice.

[¶ 1]   Brodey A. Burnett was convicted on one count of attempted second degree murder and two counts of aggravated assault and battery.   The trial court merged all three counts for purposes of sentencing, and sentenced Mr. Burnett to a prison term of twenty to thirty years.   Mr. Burnett appeals his

conviction, focusing mainly on jury instructions he claims were improper. We will affirm.

### ISSUES

[¶ 2] Mr. Burnett presents three issues, which we have reworded slightly:

1. Was the jury properly instructed on the elements of attempted second degree murder?

2. Was the jury properly instructed on the definition of "recklessly," one of the elements of aggravated assault and battery?

3. Does the fact that the elements of attempted second degree murder and the elements of aggravated assault and battery are identical deny Mr. Burnett due process of law?

### FACTS

[¶ 3] On December 25, 2009, Willie Wheeler and his younger brother, Beau, spent the day snowboarding. As they returned home to Lander that evening, Willie[1] received a phone call from Amber Mefferd, whom he described as a "good friend." She invited Willie and Beau to join her and Alyssa Jurado at a party at another friend's home in Riverton. They agreed, and met Ms. Mefferd and Ms. Jurado at the party at about 10 p.m. Because Willie had plans for the next day, the four decided to leave the party around midnight. They were going to leave Ms. Jurado's car at her mother's home in Riverton, then all of them would take Willie's SUV to his home in Lander.

[¶ 4] As they left the party, they saw Mr. Burnett standing near Ms. Jurado's car. Willie recognized Mr. Burnett from a previous encounter. According to Willie's testimony, Mr. Burnett "showed up" at a party at Willie's home a few months earlier, and "Problems did arise." Beau also testified to a previous "confrontation with Mr. Burnett." Nevertheless, Mr. Burnett asked them for a ride, saying that he wanted to "party out" with them at Willie's home in Lander. He was told there was not going to be a party at Willie's home because they were all going home to get some sleep. But Mr. Burnett was "insistent," and Beau eventually agreed to give him a ride as far as Ms. Jurado's mother's home. Mr. Burnett lived nearby, and Beau told him he could walk home from there. They left, with Willie and Ms. Mefferd in Willie's SUV, and Beau, Ms. Jurado, and Mr. Burnett in Ms. Jurado's car.

[¶ 5] Beau testified that, during the ride to Ms. Jurado's mother's home, Mr. Burnett "was saying stuff about my brother and wanting to fight him and all of that." According to Ms. Jurado, Mr. Burnett was "yelling around. He was just yelling." They arrived at Ms. Jurado's mother's house, and Beau parked Ms. Jurado's car at the curb. Willie stopped his SUV nearby. Mr. Burnett exited Ms. Jurado's car and approached Willie's vehicle, asking Willie again for a ride to Lander to party. Willie again told Mr. Burnett that they were not going to party, and refused to give him a ride. Mr. Burnett responded by yelling at Willie and "pounding" on the windows of the SUV. Apparently referring to their earlier encounter, Mr. Burnett asserted that "this stuff between us isn't over," and said it was time to finish it. Willie responded, "Okay, let's settle it right here," and stepped out of his SUV. Preparing to fight with Mr. Burnett, Willie took off his jacket and handed it to Beau, who was standing nearby. Willie provided this testimony about the incident that followed:

Q [by the Prosecutor] After you tossed your jacket to Beau, what did you do?

A I started approaching Mr. Burnett.

Q And what happened?

A He pulled a knife.

Q He pulled a knife from where?

A Out of his front right pocket....

Q What did you do when you saw that?

A I put my hands up and told Mr. Burnett, "Hey, we don't need to do anything stupid tonight. You don't want to ruin your life, you don't want to ruin mine. Just call it good and we'll go from here."

. . .

Q Did you have anything in your hands?

A No, ma'am.

---

1. Because the brothers have the same last name, we will refer to them by their first names.

Q Where was Beau at that point?

A He was still at the back of the truck by the back doors, still about four, five [feet] away from me.

Q What did you do at that point after you told him you didn't want any trouble? What happened next?

A I went to ... get a flashlight out of the back of my truck.

Q Why were you looking for a flashlight at that point?

A To defend myself....

Q As you were reaching into that vehicle or looking for the flashlight that you described, what happened next?

A One of the girls, I don't know which one it was, screamed, and I felt a large pound on my back. I didn't know what it was. Thought it was just a punch.

[¶ 6] Ms. Mefferd and Ms. Jurado also thought Mr. Burnett had punched Willie in the back. Beau, however, had seen the knife in Mr. Burnett's hand, and yelled to Willie that he had been stabbed. Beau tried to get Willie into the SUV and away from Mr. Burnett, but Mr. Burnett came at them again, cursing and lunging at them with the knife. After chasing them around the vehicle, Mr. Burnett "took off to the east." Willie and Beau jumped into the SUV, with Willie in the driver's seat and Beau in the back seat. Willie drove away.

[¶ 7] Willie drove only a short distance before he began coughing up blood. He stopped the vehicle and started to get out so that Beau could drive. He collapsed to the ground. Beau helped him into the back seat, then got in behind the wheel. As Beau started driving toward the hospital, Ms. Jurado called 911. When they arrived at the hospital, Willie was taken into the emergency room and received immediate medical attention.

[¶ 8] One of the doctors who treated Willie in the emergency room testified that Willie had suffered a stab wound near the middle of his back just to the left of his spine. The doctors inserted a tube into Willie's chest. Willie continued to bleed through that tube, and his pulse rate stayed high, indicating that he was losing blood. Willie eventually lost about three and a half liters of blood, the doctor testified, which was significant for a person whose normal blood volume would be about five liters. The doctor termed such substantial blood loss as "dangerous" and "life-threatening." In addition, Willie's lung remained collapsed—a condition the doctor termed "urgent"—and the doctors determined that he needed chest surgery. Because that surgery was generally not performed in the Riverton hospital, arrangements were made to send Willie on a Life Flight to Casper. The surgery performed there revealed a laceration of the intercostal artery, a large artery "that runs along the rib, supplying the rib and the muscles around there." Willie was hospitalized for five days, and was released on January 1, 2010.

[¶ 9] Based on his observations, the doctor described Willie's condition as critical due to his injuries. He estimated that Willie's odds of surviving the stabbing had been "no more than 50/50, based on the amount of blood loss, the continuing blood loss."

[¶ 10] Before Willie was flown from the hospital in Riverton, he gave a statement to a police officer. According to the officer, Willie said that he had been stabbed by Mr. Burnett, and also reported a "previous incident with Mr. Burnett where they had been in a physical altercation." Ms. Mefferd and Ms. Jurado also spoke to the police officer, reporting that Willie had been stabbed by Mr. Burnett. An investigation at the scene revealed footprints in the fresh snow around where the vehicles were parked, and "a small spot that appeared to be blood on the ground in the snow." The police officer followed one set of prints, made by athletic shoes, going away toward the east, eventually leading to a house the officer recognized as belonging to Mr. Burnett's mother and step-father. After a back-up officer arrived, the investigating officer knocked at the door, and the step-father answered. He said he did not think Mr. Burnett was there, but gave the officers permission to look inside.

[¶ 11] The officers found Mr. Burnett asleep on a couch in the basement. They found a pair of black basketball shoes on the floor next to the couch, the soles of which

were consistent with the prints the investigating officer had followed from the scene of the incident. They found two knives on a table located near Mr. Burnett. The knife with a black blade had a substance on it that appeared to be blood. The officers collected the shoes and the knives as evidence. They also took the blue jeans that Mr. Burnett had been wearing, and upon inspection, they found what appeared to be blood spots inside the front right pocket and outside the back right pocket.

[¶ 12] Mr. Burnett was arrested and charged with attempted second degree murder. He was also charged with one count of aggravated assault and battery inflicting serious bodily injury, and one count of aggravated assault and battery with a deadly weapon. After hearing the evidence summarized above, the jury convicted him on all three counts. Because all three counts arose from the same incident, the district court ordered the counts merged for purposes of sentencing, and sentenced Mr. Burnett to a term of twenty to thirty years in prison. Mr. Burnett asks this Court to review and reverse his conviction.

### DISCUSSION

#### Jury Instructions—Standard of Review

[¶ 13] In his first two issues, Mr. Burnett challenges the jury instructions given by the district court in his trial. The record reveals that Mr. Burnett did not object to any of the jury instructions at issue. We therefore review these jury instructions for plain error. To establish plain error in regard to jury instructions, Mr. Burnett must show that the record clearly sets forth the jury instructions at issue; that those instructions clearly and obviously, not merely arguably, violated an established and unequivocal rule of law; and that the error materially prejudiced his right to a fair trial. *Bloomfield v. State*, 2010 WY 97, ¶ 9, 234 P.3d 366, 369 (Wyo.2010); *Causey v. State*, 2009 WY 111, ¶ 18, 215 P.3d 287, 293 (Wyo. 2009).

[¶ 14] "When reviewing questions involving jury instructions, we afford the trial court significant deference." *Bloomfield*, ¶ 9,

234 P.3d at 369. We do not single out individual jury instructions or parts of them, but rather, we consider the jury instructions as a whole. *Id.* The test of their adequacy is "whether the instructions leave no doubt as to the circumstances under which the crime can be found to have been committed." *Id.*, ¶ 15, 234 P.3d at 373, *quoting Mueller v. State*, 2001 WY 134, ¶ 9, 36 P.3d 1151, 1155 (Wyo.2001).

#### Jury Instructions—Attempted Second Degree Murder

[¶ 15] Mr. Burnett satisfies the first prong of the plain error test, as the district court's jury instructions are clearly set forth in the record. Those pertaining specifically to attempted second degree murder read as follows:

INSTRUCTION NO. 14

The defendant is charged in Count 1 in the Amended Information with Attempted Murder in the Second Degree. The pertinent parts of the statute concerning Attempt under which the defendant is charged in Count 1 reads in part as follows:

(a) A person is guilty of an attempt to commit a crime if: (i) With the intent to commit the crime, he does any act which is a substantial step towards commission of the crime. A "substantial step" is conduct which [is] strongly corroborative of the firmness of the person's intention to complete the commission of the crime[.]

INSTRUCTION NO. 15

The defendant is charged in Count 1 in the Amended Information with Attempted Murder in the Second Degree. The pertinent part of the statute concerning Murder in the Second Degree under which the defendant is charged in Count 1 reads in part as follows:

Whoever purposely and maliciously, but without premeditation, kills any human being is guilty of murder in the second degree[.]

INSTRUCTION NO. 16

The elements of the crime of Attempt to Commit Murder in the Second Degree as charged in this case, are:

1. On or about the 26th day of December, 2009,
2. In Fremont County, Wyoming
3. The Defendant, BRODEY A BURNETT
4. Intending to commit the crime of Murder in the Second Degree, and [sic]
5. Did an act which was a substantial step towards committing the crime of Murder in the Second Degree.

If you find from your consideration of all the evidence that each of these elements has been proved beyond a reasonable doubt, then you should find the defendant guilty.

If, on the other hand, you find from your consideration of all the evidence that any of these elements has not been proved beyond a reasonable doubt, then you should find the defendant not guilty.

INSTRUCTION NO. 17

The term malice means that the act constituting the offense charged was done intentionally, without legal justification or excuse or that the act was done in such a manner as to indicate hatred, ill will, or hostility towards another.

"Maliciously" means acting in the state of mind in which an intentional act is done without legal justification or excuse. The term "maliciously" conveys the meaning of hatred, ill will, or hostility toward another.

"Purposely" means intentionally[.]

As used in Instruction 16, "substantial step" means conduct which is strongly corroborative of the firmness of the defendant's intention to complete the commission of the crime.

[¶ 16] We must evaluate these instructions in light of the applicable statutes and our prior cases dealing with those statutes. The Wyoming statute defining second degree murder provides, in relevant part, that "Whoever purposely and maliciously, but without premeditation, kills any human being is guilty of murder in the second degree." Wyo. Stat. Ann. § 6–2–104 (LexisNexis 2009). A sepa-

rate statute, Wyo. Stat. Ann. § 6–1–301(a), provides that:

(a) A person is guilty of an attempt to commit a crime if:

(i) With the intent to commit the crime, he does any act which is a substantial step towards commission of the crime. A "substantial step" is conduct which is strongly corroborative of the firmness of the person's intention to complete the commission of the crime.

Reading the language of these two statutes together, we have held that a person may be convicted of attempted second degree murder only if a jury makes two related findings: first, that he intentionally performed an act constituting a substantial step toward completing the underlying crime of second degree murder; and second, that he acted "purposely and maliciously" as required by the statute defining second degree murder. *Bloomfield,* ¶ 13, 234 P.3d at 372; *Reilly v. State,* 2002 WY 156, ¶ 12, 55 P.3d 1259, 1263 (Wyo.2002). Thus, the instructions in Mr. Burnett's case needed to inform the jury that, to convict him, it had to find that Mr. Burnett intentionally stabbed Willie, and that he did so purposely and maliciously. *See Bloomfield,* ¶ 14, 234 P.3d at 373.

[¶ 17] Mr. Burnett focuses on Instruction No. 16. He points out that it did not include acting purposely and maliciously on the list of the elements of the crime. Accordingly, he claims that "the jury was not informed of the necessary elements of malice and purpose," as set forth in Wyo. Stat. Ann. § 6–2–104, and that his conviction was in error because the jury "never determined whether these had been proven beyond a reasonable doubt."

[¶ 18] Mr. Burnett is obviously correct that Instruction No. 16 did not include the words "purposely and maliciously." However, we do not evaluate Instruction No. 16 by itself, but consider it in context with the other instructions relating to attempted second degree murder. Instruction No. 16 informed the jury that, to find Mr. Burnett guilty, it must find that he intended "to commit the crime of Murder in the Second Degree." Instruction No. 15, immediately

prior to the instruction on which Mr. Burnett focuses, informed the jury that a person must act "purposely and maliciously" to commit the crime of second degree murder. Instruction No. 17, immediately following the instruction at issue, defined both purposely and maliciously. These instructions, as a whole, adequately informed the jury that it must find Mr. Burnett had acted purposely and maliciously in order to convict him of attempted second degree murder. Mr. Burnett has not demonstrated that these jury instructions were in clear and obvious violation of an established and unequivocal rule of law. Consequently, we do not conclude that they were plainly erroneous.

*Jury Instructions—Aggravated Assault and Battery*

[¶ 19] In a very short argument, Mr. Burnett contends that the district court inadequately instructed the jury on the definition of "recklessly" as related to the crime of aggravated assault and battery causing serious bodily injury. Wyo. Stat. Ann. § 6–2–502(a)(i) provides that a person is guilty of aggravated assault and battery if he "Causes or attempts to cause serious bodily injury to another intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life." Based on this statutory language, we have previously held that, "in an aggravated assault and battery trial, the jury should be given an instruction defining 'reckless under circumstances manifesting extreme indifference to the value of human life' rather than just 'reckless.'" *O'Brien v. State*, 2002 WY 63, ¶ 21, 45 P.3d 225, 232 (Wyo.2002).

[¶ 20] Mr. Burnett points to the following definition of the term recklessly, given by the district court in Instruction No. 22:

"Recklessly" is defined as the following conduct: A person acts recklessly when he consciously disregards a substantial and unjustifiable risk that the harm he is accused of causing will occur, and the harm results. The risk shall be of such nature and degree that disregarding it constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.

He complains that this definition does not incorporate the concept of "recklessly under circumstances manifesting extreme indifference to the value of human life," as required for aggravated assault and battery.

[¶ 21] His argument overlooks the other instructions relating to aggravated assault and battery that set forth precisely the language at issue:

INSTRUCTION NO. 18

The defendant is charged in Count 2 in the Amended Information with Aggravated Assault and Battery. The pertinent parts of the statute under which the defendant is charged in Count 2 read[ ] in part as follows:

(b) A person is guilty of aggravated assault and battery if he:

(i) Causes serious bodily injury to another intentionally, knowingly or recklessly *under circumstances manifesting extreme indifference to the value of human life* [.]

INSTRUCTION NO. 19

The elements of the crime of Aggravated Assault and Battery, as charged in this case are:

1. On or about the 26th day of December, 2009

2. In the County of Fremont, Wyoming.

3. The Defendant, BRODEY A BURNETT

4. Intentionally, knowingly or recklessly *under circumstances which showed an extreme indifference to human life*

5. Caused serious bodily injury to another person, Willie Wheeler.

If you find from your consideration of all the evidence that each of these elements has been proved beyond a reasonable doubt, then you should find the defendant guilty.

If, on the other hand, you find from your consideration of all the evidence that any of these elements has not been proved beyond a reasonable doubt, then you should find the defendant not guilty.

(Emphasis added.) Again, we do not focus solely on Instruction 22, as Mr. Burnett does, but on the instructions as a whole. *Bloomfield*, ¶ 9, 234 P.3d at 369. Considering all of the instructions, we conclude that the jury was adequately instructed on the element of "recklessly under circumstances manifesting extreme indifference to the value of human life" for purposes of the crime of aggravated assault and battery.

[¶ 22] We also note that Wyo. Stat. Ann. § 6–2–502(a)(i) provides that a person is guilty of aggravated assault and battery if he "Causes or attempts to cause serious bodily injury to another intentionally, knowingly *or* recklessly under circumstances manifesting extreme indifference to the value of human life." (Emphasis added.) The legislature's use of the word "or" indicates that any one of the three states of mind is sufficient to support a conviction. In a special verdict form in Mr. Burnett's case, the jury found that he had acted "intentionally," *and* "knowingly," *and* "recklessly under circumstances which showed extreme indifference to the value of human life." Thus, even if the district court had not properly instructed the jury on the definition of reckless, the jury's findings that he acted intentionally and knowingly would be sufficient to sustain Mr. Burnett's conviction. We conclude that the jury instructions regarding aggravated assault and battery causing serious bodily injury were not in error and caused no prejudice to Mr. Burnett.

### Elements of Attempted Second Degree Murder and Aggravated Assault and Battery

█ [¶ 23] In his third issue, Mr. Burnett claims that the elements of attempted second degree murder are identical to the elements of aggravated assault and battery. He asserts that, because the two crimes are identical, it is left "to the whim of the prosecutor" to decide which crime to charge, and the prosecutor is free to make that decision on arbitrary and discriminatory bases. This, Mr. Burnett claims, is a violation of his constitutional rights.

[¶ 24] We do not agree that the elements of the two crimes are identical. Mr. Burnett was charged with two separate counts of aggravated assault and battery. The two counts were based on separate statutory provisions, Wyo. Stat. Ann. § 6–2–502(a)(i), and Wyo. Stat. Ann. § 6–2–502(a)(ii), which provide that a person is guilty of aggravated assault and battery if he:

(i) Causes or attempts to cause serious bodily injury to another intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life; [or]

(ii) Attempts to cause, or intentionally or knowingly causes bodily injury to another with a deadly weapon.

[¶ 25] The second of these statutory provisions defines the crime of aggravated assault and battery with a deadly weapon. Applying this definition, a person must use a deadly weapon to be convicted of this crime. A person need not use a deadly weapon in order to be convicted of attempted second degree murder. Plainly, these two crimes do not have identical elements.

[¶ 26] The other statutory provision defines the crime of aggravated assault and battery causing serious bodily injury. Applying this definition, a person must act "intentionally, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life" in order to be convicted. In contrast, to be convicted of attempted second degree murder as defined by Wyo. Stat. Ann. §§ 6–2–104 and 6–1–301, and as discussed under Mr. Burnett's first issue, a person must act "purposely and maliciously."

█ [¶ 27] Mr. Burnett asserts that the term "purposely," an element of attempted second degree murder, is synonymous with "intentionally" and "knowingly," elements of aggravated assault and battery. Section 21.01C of the Wyoming Criminal Pattern Jury Instructions states that " 'Purposely' means intentionally," providing support for Mr. Burnett's assertion. However, to be convicted of attempted second degree murder, a person must act both purposely and maliciously. *Bloomfield*, ¶ 14, 234 P.3d at 373; *Guy v. State*, 2008 WY 56, ¶ 38, 184 P.3d 687, 698 (Wyo.2008). The term mali-

ciously conveys the meaning of hatred, ill will, or hostility toward another. *Butcher v. State*, 2005 WY 146, ¶ 24, 123 P.3d 543, 550–51 (Wyo.2005). Acting "maliciously" is an element of attempted second degree murder, but it is not an element of aggravated assault and battery causing serious bodily injury. The elements of the two crimes are not identical.

[¶ 28] We do not ignore the similarity between "maliciously" and "recklessly under circumstances manifesting extreme indifference to the value of human life." But even if these different elements of the two crimes were functionally equivalent, our precedent firmly establishes that the overlap does not violate Mr. Burnett's constitutional rights. In *Johnson v. State*, 2003 WY 9, ¶ 25, 61 P.3d 1234, 1245 (Wyo.2003), Mr. Johnson contended that two separate criminal statutes, one defining first degree felony murder and the other defining child abuse, punished "virtually identical conduct in two very disparate ways." Felony murder carried a potential death penalty, while child abuse was punishable by a maximum sentence of five years in prison. Quoting dicta from *Small v. State*, 689 P.2d 420, 425 (Wyo.1984), Mr. Johnson asserted that "wherever two or more statutes provide different punishment for exactly the same criminal conduct, equal protection is violated." *Johnson*, ¶ 25, 61 P.3d at 1245. This is, in effect, the same argument now presented by Mr. Burnett.

[¶ 29] We squarely rejected Mr. Johnson's argument in light of the United States Supreme Court decision in *United States v. Batchelder*, 442 U.S. 114, 99 S.Ct. 2198, 60 L.Ed.2d 755 (1979), a case that dealt with two provisions prohibiting convicted felons from possessing firearms, one with a maximum penalty of two years and one with a maximum penalty of five years. Although the United States Supreme Court agreed that the provisions were "overlapping," it also noted that both provisions unambiguously specified the prohibited conduct and the penalties available upon conviction.

> That this particular conduct may violate both Titles does not detract from the notice afforded by each. Although the statutes create uncertainty as to which crime may be charged and therefore what penalties may be imposed, they do so to no greater extent than would a single statute authorizing various alternative punishments. So long as overlapping criminal provisions clearly define the conduct prohibited and the punishment authorized, the notice requirements of the Due Process Clause are satisfied.

*Id.* at 123, 99 S.Ct. at 2204. With regard to equal protection rights, the Court wrote that, "when an act violates more than one criminal statute, the Government may prosecute under either so long as it does not discriminate against any class of defendants." *Id.* at 123–24, 99 S.Ct. at 2204.

[¶ 30] Following the lead of the United States Supreme Court in *Batchelder*, we held that overlapping criminal statutes did not violate Mr. Johnson's federal or state rights to due process or equal protection. *Johnson*, ¶ 32, 61 P.3d at 1248. As Mr. Burnett concedes, we have approved and applied the *Batchelder* decision in numerous cases. *E.g. Worcester v. State*, 2001 WY 82, ¶ 26, 30 P.3d 47, 55–56 (Wyo.2001); *Duffy v. State*, 789 P.2d 821, 826 (Wyo.1990); *Kallas v. State*, 704 P.2d 693, 694–95 (Wyo.1985). Mr. Burnett has not convinced us to depart from this precedent.

[¶ 31] Mr. Burnett's conviction is affirmed.

BURKE, J., delivers the opinion of the Court; VOIGT, J., files a specially concurrence.

VOIGT, Justice, specially concurring.

[¶ 32] I concur in the majority opinion, writing separately only to note that I continue to believe that the sentences need not have merged. *See Winstead v. State*, 2011 WY 137, ¶ 16, 261 P.3d 743, 746 (Wyo.2011) (Voigt, J., specially concurring).